IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PACIFIC COMMERCIAL SERVICES, LLC, a Hawaii limited liability company,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>LVI ENVIRONMENTAL SERVICES, INC., nka NORTHSTAR CONTRACTING GROUP, INC., a California corporation; NORTHSTAR RECOVERY SERVICES, INC., a Delaware corporation,<br><br>　　　　　Defendants. | Civ. No. 16-00245 JMS-KJM<br><br>ORDER**:** (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT, ECF NO. 80; (2) DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I AND II OF COMPLAINT, ECF NO. 46; AND (3) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS III, IV, AND V OF COMPLAINT, ECF NO. 90 |

**ORDER: (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT, ECF NO. 80; (2) DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I AND II OF COMPLAINT, ECF NO. 46; AND (3) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS III, IV, AND V OF COMPLAINT, ECF NO. 90**

## I.  INTRODUCTION

Plaintiff Pacific Commercial Services, LLC ("PCS") agreed to serve

as a subcontractor for Defendants LVI Environmental Services, Inc. ("LVI") and

Northstar Recovery Services, Inc. ("Northstar Recovery") (collectively,

"Defendants") in two separate projects: (1) the deactivation of the Honolulu Electric Company ("HECO") Honolulu Power Plant (the "HECO Project"); and (2) the demolition and remediation of the building housing the Battery Energy Storage System ("BESS") at the Kahuku Wind Farm (the "Kahuku Project"). Northstar Recovery and LVI share the same parent company, Northstar Group Holdings, LLC.

PCS brought suit against Defendants alleging claims for breach of contract and unjust enrichment related to both the HECO Project and the Kahuku Project. Compl., ECF No. 1-3. LVI then filed a Counterclaim against PCS, also alleging claims for breach of contract and unjust enrichment, but only concerning the HECO Project. Countercl., ECF No. 8-1.

Presently before the court are three motions: (1) PCS's Amended Motion for Partial Summary Judgment ("PCS's HECO Motion"), ECF No. 80; (2) Defendants' Motion for Partial Summary Judgment on Counts I and II of Complaint ("Defendants' HECO Motion"), ECF No. 46; and (3) Defendants' Amended Motion for Partial Summary Judgment on Counts III, IV, and V of Complaint ("Defendants' Kahuku Motion"), ECF No. 90. For the reasons that follow, the court: (1) GRANTS in part and DENIES in part Plaintiff's HECO Motion; (2) DENIES Defendants' HECO Motion; and (3) GRANTS in part and DENIES in part Defendants' Kahuku Motion.

## II. BACKGROUND

**A.  Factual Background**

*1.  The HECO Project*

In 2011, LVI was preparing to bid for the prime contract on the HECO Project, and solicited PCS to submit a subcontractor proposal for waste removal services.  Chang Decl. ¶ 5, ECF No. 81-1 ("First Chang Decl.").  LVI had no prior work history with HECO, but PCS had worked on over one hundred HECO projects at the time.  Ex. 40, ECF No. 81-42; First Chang Decl. ¶ 6.  PCS submitted a subcontractor proposal to LVI on July 23, 2011.  Ex. 2, ECF No. 81-4.  LVI submitted its bid for the HECO Project on July 29, 2011, and was awarded the prime contract on December 15, 2011.  Ex. 35, ECF No. 81-37; Ex. 36, ECF No. 81-38.

In LVI's proposal to HECO, LVI listed PCS as one of four subcontractors, describing the scope of PCS's work as "Asbestos, Hazardous, Regulated and Universal Waste Materials Hauling and Disposal" and "Hazardous and Regulated Materials Cleaning and Removal."  Ex. 35 at 12, ECF No. 81-37.  LVI described the work of the other three listed subcontractors as (1) "Scaffolding"; (2) "Painting"; and (3) "Plumbing/Roof Drains."  *Id.*  PCS began completing the work outlined in its subcontractor proposal before any purchase order was completed.  First Chang Decl. ¶ 16.

3

On March 23, 2012, LVI employee Chad Maddock ("Maddock") emailed a draft purchase order to PCS's General Manager Jingbo Chang ("Chang"). Ex. 11, ECF No. 81-13. Later that day, Chang addressed concerns with the draft purchase order in two reply emails to Maddock. Ex. 12, ECF No. 81-14; Ex. 13, ECF No. 81-15. In particular, Chang was concerned with "Line Item 4" of the purchase order, which stated that the transportation and disposal of "Hazardous Solids" would cost $700 per ton. Ex. 12, ECF No. 81-14; Ex. 11 at 4, ECF No. 81-13. That price assumed that PCS would be handling "bulk solid at large volume to Chem Waste." Ex. 12, ECF No. 81-14. But because the waste stream was "mixed with asbestos and liquid too at small quantity," PCS would need to send it to "Clean Harbors" instead of "Chem Waste," resulting in "a much higher price." *Id.*

On April 4, 2012, Maddock sent Chang another email, listing seven proposals aimed at resolving Chang's concerns. Ex. 14, ECF No. 81-16. In response to Chang's comments on line item 4, Maddock said: "Leave line item 4 as is with the understanding that this pricing is for volume loads in container amounts. Smaller volume will require appropriate adjustment. Additionally, if characterization changes due to contents of material, there could be price adjustments." *Id.* That same day, Chang replied to Maddock and said: "We accept

4

what you proposed below.  Please revise it and send it to me for signature."  Ex. 15, ECF No. 81-17.

On April 23, 2012, LVI employee Damariz Quezada ("Quezada") sent a revised purchase order (the "Subcontract") to Chang, requesting that he sign and return it.  Ex. 16, ECF No. 81-18.  Line item 4 of the Subcontract still priced hazardous solids at $700 per ton, but added the following language: "Smaller volume will require appropriate adjustment.  Additionally, if characterization changes due to contents of material, there could be price adjustments."  *Id.* at 4. Chang did not sign the Subcontract.[1]  But PCS continued to prepare Waste Manifest Forms for the HECO Project and handle the transportation and disposal of waste.  First Chang Decl. ¶¶ 25-26.  And in total, LVI paid PCS $526,376.04 for its services on the HECO Project.  *Id.* ¶ 38; Ex. 32, ECF No. 81-34.

In early 2013, LVI began to use other firms for the HECO Project's waste transportation and disposal services.  PCS only learned of this when it received copies of Waste Manifest Forms that it had prepared for LVI, but PCS's name was crossed out and replaced in writing with the name of another firm.  First Chang Decl. ¶ 34; Ex. 28, ECF No. 81-30.  The forms have dates ranging from January 2013 to March 2013.  Ex. 28, ECF No. 81-30.  On February 5, 2013,

---

[1] Later, on October 22, 2012, Chang signed a revised version of the Subcontract.  Ex. 17, ECF No. 81-19.

Michael Moore ("Moore"), President of LVI, emailed Chang to notify him that LVI "went direct to [another waste disposal firm] and struck a deal for disposal," but that LVI "definitely want[s] to use [PCS] for the remaining haz removal/disposal if [PCS is] willing." Ex. 29, ECF No. 81-31.

On August 14, 2013, Moore emailed Chang alleging that two of PCS's invoices -- Invoice 7864-01 and Invoice 7864-05 -- incorrectly billed LVI at a rate of $700 per *drum* instead of $700 per *ton*. Ex. 23, ECF No. 81-25. Chang disagreed, stating that the price adjustment was correctly calculated pursuant to line item 4. *Id.* Moore mailed Chang a letter dated August 28, 2013, noting that the (allegedly) incorrectly billed activity occurred on July 17, 2012, and April 9, 2013, and resulted in a total overbilling of $25,200. Ex. 24, ECF No. 81-26.

At no time did LVI send written notice to PCS terminating PCS's involvement in the HECO Project.

### 2.    *The Kahuku Project*

Defendants hired Plaintiff to provide waste removal and transportation services for the Kahuku Project. Second Chang Decl. ¶ 3, ECF No. 98-1. Plaintiff's work on the Kahuku Project occurred in two phases: environmental control and evidence investigation ("Phase 1") and demolition and disposal of the BESS building ("Phase 2"). *Id.* ¶ 8.

a.     *Phase 1*

Plaintiff performed work in Phase 1 pursuant to three purchase orders that Defendants issued to Plaintiff.  *Id.* ¶ 9; Exs. 1-3, ECF No. 98.  Although Plaintiff performed the services within the scope of the purchase orders, Defendants have refused to pay eleven invoices covering that work.  Second Chang Decl. ¶ 11.  Separately, Plaintiff performed work outside of the scope of the purchase orders, and Defendants have refused to pay three invoices covering that work.  *Id.* ¶ 12; Exs. 15-17, ECF No. 98.  Collectively, Defendants have refused to pay invoices totaling $66,518.31 for these services (the "Phase 1 Work").

The purchase orders each contain the following "pay-if-paid" provision:

> Upon written approval by Contractor and the Owner, Subcontractor's invoice shall be paid, in the net amount of its request, if and only if, Contractor receives payment from the Owner for said invoice.  Contractor's receipt of payment from Owner for Subcontractor's invoice is an express condition precedent to Contractor's obligation to make payment to Subcontractor.  If Contractor does not receive payment from the Owner for said invoice, notwithstanding whether same was approved, the Contractor shall have no further obligation to pay Subcontractor.  If Contractor has withheld retention, same shall be paid to the Subcontractor after approval and acceptance of the entire project by the Owner.  Subcontractor's [sic] acknowledges its payment is contingent upon the Owner paying the Contractor.

Ex. 1 at 3, ECF No. 98-3.  Defendants claim that they did not pay Plaintiff for the

Phase 1 Work because Xtreme Power -- the "Owner" -- did not pay Defendants.

Bruce Decl. ¶¶ 8-9, ECF No. 91-1.

### b.    Phase 2

Northstar Recovery and PCS entered into a subcontract for hauling

and disposing of materials from the BESS building (the "Phase 2 Work") in

September 2012, but Northstar Recovery was never awarded the prime contract for

demolition of the BESS building and PCS never performed any of the Phase 2

Work.[2]  *Id.* ¶¶ 3-4; Second Chang Decl. ¶¶ 15-16.  The prime contract was

awarded to GZA GeoEnvironmental, Inc. ("GZA"), which subcontracted part of

the work to NCM Contracting Group, LP ("NCM Contracting") in January 2013.

Bruce Decl. ¶¶ 5-6.  At that time, NCM Contracting was a competitor to

Defendants.  *Id.* ¶ 6.  Later, in April 2014, Defendants' affiliate acquired NCM

Contracting.  Answer ¶ 40, ECF No. 103.  Defendants did not receive money or

benefit from the BESS building contract.  Bruce Decl. ¶ 7.

## B.    Procedural Background

On April 19, 2016, PCS filed its Complaint in the Circuit Court of the

First Circuit, State of Hawaii, and on May 18, 2016, Defendants filed a Notice of

---

[2] Although not clear from the record, it appears that Northstar Recovery agreed to the subcontract for the Phase 2 Work in anticipation of obtaining the prime contract, but it never did.

Removal. ECF No. 1-3; ECF No. 1. Defendants filed a Counterclaim on May 26, 2016, and PCS filed an Amended Complaint on April 27, 2017. ECF No. 8-1; ECF No. 82.

PCS's HECO Motion was filed on April 27, 2017.[3] ECF No. 80. Defendants filed their Opposition on May 9, 2017, and PCS filed its Reply on May 16, 2017. ECF No. 93; ECF No. 100. Defendants' HECO Motion was filed on February 21, 2017, and Defendants' Kahuku Motion was filed on May 5, 2017.[4] ECF No. 46; ECF No. 90. PCS filed its Oppositions on May 9, 2017, and Defendants filed their Replies on May 16, 2017. Pl.'s HECO Opp'n, ECF No. 95; Pl.'s Kahuku Opp'n, ECF No. 96; Defs.' HECO Reply, ECF No. 101; Defs.' Kahuku Reply, ECF No. 102.

A hearing was held on May 30, 2017 (the "May 30, 2017 hearing").

## III. STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential

---

[3] PCS's HECO Motion was originally filed on February 21, 2017, ECF No. 44, but the court later granted PCS leave to amend its motion, ECF No. 78.

[4] Defendants' Kahuku Motion was originally filed on February 21, 2017, ECF No. 47, but the court later granted Defendants leave to amend their motion, ECF No. 89.

to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact*." Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at

248).  When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV.  <u>DISCUSSION</u>

### A.  Cross Motions Concerning the HECO Project

Both parties seek summary judgment on Plaintiff's claims for breach of contract and unjust enrichment, and Plaintiff further seeks summary judgment on Defendants' Counterclaim for breach of contract and unjust enrichment.  In order to rule on the motions, the court first determines whether there is a valid contract, and if so, what type of contract it is.

#### 1.  *The Subcontract Is a Valid Contract*

In Hawaii, "[t]here must be a mutual assent or a meeting of the minds on all essential elements or terms to create a binding contract." *Earl M. Jorgensen Co. v. Mark Constr., Inc.*, 540 P.2d 978, 982 (Haw. 1975).  This is determined by an objective standard, where "[a] party's words or acts are judged under a standard of reasonableness in determining whether he has manifested an objective intention to agree." *Id.*  And absent a statute requiring a signature to evidence assent, "the general rule is that ' . . . parties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by the acceptance of benefits under the contract, or the acceptance by one of the

performance by the other.'" *Credit Assocs. of Maui, Ltd. v. Carlbom*, 50 P.3d 431, 437-38 (Haw. Ct. App. 2002) (quoting 17A Am. Jur. 2d *Contracts* § 185 (1991)) (emphasis omitted).

The objective evidence here -- primarily an email exchange occurring between March and April 2012 -- demonstrates that LVI and PCS engaged in a bargained for exchange and agreed to a contract. First, on March 23, 2012, LVI emailed PCS a "Subcontract/Purchase Order" that included items such as (1) the names of the parties; (2) the scope of PCS's work; (3) the location where the work would be performed; (4) the prices of various services; (5) indemnification provisions; and (6) termination provisions. Ex. 11, ECF No. 81-13. In fact, this proposal contains a provision stating that "Subcontractor *agrees to be bound* to Contractor by the terms of the Agreement for this project." *Id.* ¶ 2 (emphasis added). This email clearly proposes a contract between LVI and PCS.

In response, PCS emailed LVI that same day and raised several concerns with the proposal and suggested modifications. Ex. 12, ECF No. 81-14; Ex. 13, ECF No. 81-15. On April 4, 2012, LVI emailed PCS back with proposed revisions to address PCS's concerns, and stated: "Let me know if these are acceptable to PCS and we will get this out to you." Ex. 14, ECF No. 81-16. PCS then answered "We *accept* what you proposed below. Please revise it and send it to me for signature." Ex. 15, ECF No. 81-17 (emphasis added). Nineteen days

after PCS's acceptance, LVI emailed PCS the revised Subcontract.  Ex. 16, ECF No. 81-18.  This email exchange demonstrates a proposal of a contract, bargained-for revisions to the contract, a meeting of the minds on all essential terms, and finally, an acceptance of the Subcontract.

LVI argues that the Subcontract is invalid because PCS did not sign and return it.  Defs.' HECO Mot. at 7.  But "parties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated."  *Carlbom*, 50 P.3d at 437 (emphasis omitted).  PCS clearly indicated its assent to be bound by the Subcontract in three ways.  First, in Chang's April 2, 2012 email, he explicitly told LVI: "We *accept* what you proposed below."  Ex. 15, ECF No. 81-17 (emphasis added) (referring to the Subcontract).  Second, PCS evidenced its assent "by the acceptance of benefits under the contract," *Carlbom*, 50 P.3d at 437, such as payments totaling $526,376.04 from LVI for PCS's work on the HECO Project.  First Chang Decl. ¶ 38.  And finally, PCS demonstrated its acceptance through beginning performance under the Subcontract, a method of acceptance permitted in the Subcontract itself.  Ex. 16 at 5, ECF No. 81-18 (beginning a list of Terms and Conditions with "By signing and returning this Subcontract/Purchase Order, *or by partial or complete performance under this Subcontract/Purchase Order*, you, as Subcontractor or Supplier (hereinafter "Subcontractor"), agree with Contractor as follows" (emphasis added)).

13

LVI next argues that the Subcontract was not a final contract, but part of ongoing negotiations that continued through October 2012. Defs.' Reply at 2-4. LVI's evidence for this argument is primarily based on an October 22, 2012 email from PCS to LVI proposing revisions to the Subcontract. *Id.* (citing Ex. 18, ECF No. 97-20). LVI reads too much into the October 22, 2012 email. PCS had already indicated its acceptance of the Subcontract in multiple ways, and there is no evidence of any "ongoing negotiations" between April and October 2012. In any event, Chang accepted the Subcontract on April 2, 2012, without conditioning his acceptance on further revisions. Ex. 15, ECF No. 81-17. Any subsequent attempts in October 2012 to revise the Subcontract do not change the clear and unmistakable mutual assent of the parties in April 2012.

Thus, the court finds that the Subcontract is a valid, binding contract between PCS and LVI.

### 2. *The Subcontract Binds LVI to Use PCS Exclusively*

Defendants argue that, even if the Subcontract is a valid, binding contract, it does not "contain any language showing a mutual agreement to use Plaintiff as the sole and exclusive subcontractor for the HECO Project" and it was "terminable at will by LVI." Defs.' HECO Reply at 9; Defs.' HECO Opp'n at 21. The court disagrees.

The Subcontract describes the scope of PCS's work as "cleaning and waste transportation & disposal services at HECO Honolulu Power Plant, Honolulu Hawaii," and then proceeds to identify specific services in Exhibit A to the Subcontract. Ex. 16 at 3-4, ECF No. 81-18. And in LVI's original proposal to HECO, LVI listed PCS as one of four subcontractors, describing the scope of PCS's work as "Asbestos, Hazardous, Regulated and Universal Waste Materials Hauling and Disposal" and "Hazardous and Regulated Materials Cleaning and Removal." Ex. 35 at 12, ECF No. 81-37. LVI described the work of the other three listed subcontractors as (1) "Scaffolding"; (2) "Painting"; and (3) "Plumbing/Roof Drains." *Id.* The scope of PCS's work was limited to waste and removal services at the HECO Power Plant, but there is nothing to suggest that LVI could also hire other subcontractors to do the same work it hired PCS to complete. A plain reading of the scope of PCS's work leads to the conclusion that LVI hired PCS to complete all of the cleaning and waste removal services at the HECO Power Plant.

And this reading is consistent with the Subcontract's termination provisions. For example, Paragraph 21(b) allows LVI to terminate PCS "without cause at any time upon three (3) days written notice," which would entitle PCS to a payment "based solely upon the percentage of Work completed by [PCS]." Ex. 16 at 8, ECF No. 81-18. First, the language "percentage of Work completed" implies

15

that the scope of PCS's work extends beyond the at-will relationship that LVI suggests. That is, the Subcontract bound PCS to complete all of the cleaning and waste removal services for the HECO Project, but LVI could terminate the Subcontract for convenience and only pay a proportional amount for PCS's services. Second, the alternative reading -- that LVI could hire other subcontractors to do the same work it hired PCS to complete -- would render the termination provisions meaningless.[5] There is no point to a termination clause if LVI was not obligated to continue giving PCS work under the Subcontract.

In addition, LVI's reading of the Subcontract -- that at best it was an at will agreement that permitted LVI to bypass PCS and use another contractor to perform the HECO work -- would render LVI's promise illusory. And an illusory promise cannot constitute valid consideration. *See* 2 Arthur L. Corbin, *Corbin on Contracts* § 5.28 (2003) (stating that "an illusory promise is neither enforceable against the one making it, nor is it operative as consideration for a return promise," and that "if there is no other consideration for a return promise, the result is that no contract is created"); Restatement (Second) of Contracts § 77 cmt. a (1981) ("Where the apparent assurance of performance is illusory, it is not consideration

---

[5] And the Hawaii Supreme Court requires courts, to the extent possible, to give effect to every term of a contract. *Stanford Carr Dev. Corp. v. Unity House, Inc.*, 141 P.3d 459, 470 (Haw. 2006).

for a return promise."); *Balogh v. Balogh*, 332 P.3d 631, 661 (Haw. 2014) ("[A]

return performance that is fully optional cannot constitute consideration.").

In sum, LVI and PCS entered into a valid contract, and LVI was

contractually bound to use PCS, and only PCS, to complete cleaning and waste

removal services for the HECO Project unless it invoked one of the Subcontract's

termination provisions.

### 3. *Analysis of the Cross-Motions as to Plaintiff's Amended Complaint*

Having determined that the Subcontract is a valid, binding contract

that requires LVI to use PCS for the duration of the HECO Project unless it

exercises its right to terminate PCS pursuant to one of the Subcontract's

termination provisions, the court next turns to the cross-motions for partial

summary judgment. The court first addresses the breach of contract claim and then

addresses the unjust enrichment claim.

### a. *Breach of contract (Count I)*

Paragraph 21 of the Subcontract permits LVI to terminate PCS in only

two ways: for cause and for convenience. Ex. 16 at 8, ECF No. 81-18. Although

the provisions differ with regard to LVI's financial obligations to PCS after

termination, both provisions require LVI to "giv[e] three (3) days written notice" to

PCS before termination. *Id.*

As early as January 2013, LVI began diverting PCS's work under the Subcontract to other firms. First Chang Decl. ¶ 34; Ex. 28, ECF No. 81-30. Later, in an August 15, 2013 email to Chang, Moore explained that LVI diverted the work away from PCS because "there was no money being made for the light loads." Ex. 23, ECF No. 81-25. At the May 30, 2017 hearing, LVI admitted to diverting work away from PCS as early as January 2013, and further admitted that it failed to give PCS notice of any termination of PCS's services under the Subcontract at that time.

Because LVI diverted work away from PCS before terminating PCS under the terms of the Subcontract, the court finds that LVI breached the Subcontract as of the initial diversion of work (which appears to have been in January 2013). As to Count I of the Complaint, the court GRANTS Plaintiff's HECO Motion and DENIES Defendants' HECO Motion. The duration of the breach and the damages resulting from the breach are issues to be decided at trial.

### b. *Unjust enrichment (Count II)*

PCS's claim for unjust enrichment includes two categories of allegations. The first category covers the same actions and damages as the breach of contract claim, alleging unjust enrichment in the event that the court found that the Subcontract was not a binding agreement. Am. Compl. ¶ 56. Because the

court finds that the Subcontract is a binding agreement, this theory is now moot and thus no longer before the court.

PCS also seeks summary judgment on a theory of unjust enrichment based on a claim that it was not paid for work performed outside the scope of the Subcontract, totaling $39,435.86 for Invoices 7864-06 and 7864-07. But the Amended Complaint alleges that Invoice 7864-06 (in the amount of $14,435.86) was paid in full. *Id.* ¶ 27. Given this discrepancy, and the paucity of briefing on this matter, the court has insufficient information to rule one way or the other.

In sum, the unjust enrichment claims that fall inside the scope of the Subcontract are now moot; the Plaintiff's HECO Motion and Defendants' HECO Motion as to unjust enrichment claims that fall outside the of the Subcontract are DENIED.[6]

## 4.    *Defendants' Counterclaim*

Plaintiff has further moved for summary judgment on Defendants' Counterclaim, arguing that Plaintiff did not breach the Subcontract by charging LVI "per drum" rather than "per ton" because the Subcontract entitled PCS to

---

[6] Defendants argue that Plaintiff's unjust enrichment claim must be dismissed because Plaintiff "cannot maintain both contract and quasi-contract claims in the same action." Defs.' HECO Mot. at 2. This is clearly incorrect. *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.").

make that unilateral pricing change. Pl.'s HECO Mot. at 13-16. The court disagrees.

Line item 4 of the Subcontract lists a price of $700 per ton of "Hazardous Solids (bricks, sediments, sludge, LBP)." Ex. 16 at 4, ECF No. 81-18. It also includes, in small font, the following provision: "Smaller volume will require appropriate adjustment. Additionally, if characterization changes due to contents of material, there could be price adjustments." *Id.* In August 2013, LVI realized that PCS charged LVI a price of $700 *per drum* (rather than *per ton*) of hazardous sludge in Invoices 7864-01 and 7864-05. Ex. 23 at 2, ECF No. 81-25. The change from "per ton" to "per drum" increased the charges by $25,200. Ex. 24, ECF No. 81-26. LVI requested that PCS credit LVI for the alleged overbilling, but PCS refused. Ex. 23, ECF No. 81-25.

It is possible that the volume or the characterization of the hazardous solids in Invoices 7864-01 and 7864-05 triggered the small font provision in line item 4 of the Subcontract. But nothing in this provision entitles PCS to *unilaterally* change the price from $700 per ton to $700 per drum. Rather, the provision invites further discussion or negotiations to determine the "appropriate adjustment" -- it does *not* allow PCS to unilaterally increase the price without LVI's consent.

Because the Subcontract does not entitle PCS to make unilateral pricing increases, the court DENIES Plaintiff's HECO Motion as to Defendants' Counterclaim.

**B.      Defendants' Kahuku Motion**

Defendants further seek summary judgment on Count III, Count IV, and Count V of Plaintiff's Amended Complaint, alleging claims for breach of contract and unjust enrichment for Phase 1 and Phase 2 of the Kahuku Project. Am. Compl. ¶¶ 60-74; Defs.' Kahuku Mot. at 6-12.  The court addresses these arguments in turn.

**1.      *Phase 1: Breach of Contract (Count III) and Unjust Enrichment (Count IV)***

At the May 30, 2017 hearing, Defendants admitted that Plaintiff completed the Phase 1 Work and that they have not paid Plaintiff for that work. *See also* Bruce Decl. ¶ 9.  Defendants point to the "pay-if-paid" provisions of their purchase orders with Plaintiff,[7] reasoning that they are not obligated to pay

---

[7] The purchase orders each contain the following "pay-if-paid" provision:

> Upon written approval by Contractor and the Owner, Subcontractor's invoice shall be paid, in the net amount of its request, if and only if, Contractor receives payment from the Owner for said invoice.  Contractor's receipt of payment from Owner for Subcontractor's invoice is an express condition precedent to Contractor's obligation to make payment to Subcontractor.  If Contractor does not receive payment from the Owner for said invoice, notwithstanding whether same was

(continued . . .)

Plaintiff because they have yet to be paid by Xtreme Power or First Wind -- the owners -- for the Phase 1 Work. Defs.' Kahuku Mot. at 9-11. Pay-if-paid provisions are strictly construed. *See* Richard A. Lord, *Williston on Contracts* § 19.59 (4th ed. 2011). And under Hawaii law, "'[n]o one can avail himself of the non-performance of a condition precedent, who has himself occasioned its non-performance.'" *Ikeoka v. Kong*, 386 P.2d 855, 860 (Haw. 1963) (quoting *Sibbald v. Bethlehem Iron Co.*, 83 N.Y. 378, 384 (1881)).

LVI explains the circumstances surrounding the non-payment by the owners:

> Because of a dispute between Xtreme Power, Inc. and its insurance carrier, Chartis, over whether the fire was covered by Xtreme Power, Inc.'s insurance policy, Chartis and Xtreme Power ceased paying LVI for the services performed by LVI and its subcontractors on the Kahuku Project in the end of 2012 or early 2013. Subsequently, First Wind refused to pay for any services rendered after expiration of its lump-sum agreement with LVI despite the fact that materials supplied by LVI and its subcontractors, including PCS, remained in place at the Kahuku Project for several months thereafter. As a result, LVI was not paid by First Wind, Xtreme Power, Inc. or any other person for

---

(. . . continued)

> approved, the Contractor shall have no further obligation to pay Subcontractor. If Contractor has withheld retention, same shall be paid to the Subcontractor after approval and acceptance of the entire project by the Owner. Subcontractor's [sic] acknowledges its payment is contingent upon the Owner paying the Contractor.

Ex. 1 at 3, ECF No. 98-3. Plaintiff only challenges the application of this provision, not its validity.

the PCS invoices for the Kahuku Prokect which are at issue in this case.

Bruce Decl. ¶ 8. Notably, Defendants have *not* submitted any evidence that they actually requested payment. That is, there is no evidence of rejected billing or emails from Defendants to the owners requesting payment, nor is there evidence that the insurance dispute causing non-payment has yet to settle. The pay-if-paid provision may have created a condition precedent to paying Plaintiff, but it is unclear whether Defendants themselves occasioned its nonperformance by failing to make a sufficient effort to recover the money owed to them (and, subsequently, to Plaintiff).

Because there is a lack of evidence in the record presently before the court that Defendants made a sufficient effort to receive payment from Xtreme Power or First Wind, the court DENIES Defendants' Kahuku Motion as to Count III and Count IV of the Amended Complaint.

### 2. *Phase 2: Breach of Contract (Count V)*

PCS and Northstar Recovery agreed to a subcontract for hauling and disposing of materials from the BESS building, dated September 29, 2012, and Plaintiff claims Northstar Recovery breached that subcontract by preventing Plaintiff from performing the Phase 2 Work under their subcontract. Am. Compl. ¶¶ 70-74; Ex. 19, ECF No. 98-21.

Xtreme Power awarded the prime contract for demolition of the BESS building to GZA -- not Northstar Recovery -- and GZA then subcontracted part of it to NCM Contracting in January 2013.  Bruce Decl. ¶¶ 4-6.  And because Defendants were not awarded the prime contract, PCS could not (and in fact, did not) perform the subcontracted Phase 2 Work.  Under only these facts, the parties seem to agree that, because Northstar Recovery did not receive the prime contract and PCS did not perform any Phase 2 Work, there would be no breach of contract and PCS would not be entitled to compensation.

Rather, Plaintiff's theory is that "Defendants had a connection to the demolition job that they have not disclosed in the Motion."  Pl.'s Kahuku Opp'n at 17.  As of January 2013, NCM Contracting and Defendants were competitors, but in April 2014 (a year and three months later), Defendants' affiliate acquired NCM Contracting.[8]  Plaintiff seems to suggest that, in January 2013, Defendants conspired to have Xtreme Power award the prime contract to GZA, knowing that GZA would award a subcontract to NCM Contracting, which would be acquired by Defendants' affiliate over a year later.  To support this theory, Plaintiff points to a series of documents dated April 2014 or later -- long *after* the acquisition of NCM

---

[8] At the May 30, 2017 hearing, both parties agreed to this timeline of events.

Contracting -- that show communications between Defendants and NCM Contracting regarding then-future work on the Kahuku Project. *Id.* at 16-17.

But Plaintiff has failed to provide any evidence of actual impropriety. Nothing (other than rank speculation) refutes Defendants' signed declaration stating that, as of January 2013, Defendants and NCM Contracting were competitors. Communications that occurred over a year after the acquisition, concerning work to be performed after the acquisition, are simply not enough to raise a genuine issue of material fact.

Because Northstar Recovery did not obtain the prime contract, PCS performed none of the Phase 2 Work, Defendants and NCM Contracting were competitors at the time NCM Contracting received the subcontract, and the subsequent acquisition of NCM Contracting did not occur until over a year later, the court GRANTS Defendants' Kahuku Motion as to Count V of the Complaint.

//

//

# V. **CONCLUSION**

For the multiple reasons set forth above, the court: (1) GRANTS in part and DENIES in part Plaintiff's HECO Motion; (2) DENIES Defendants' HECO Motion; and (3) GRANTS in part and DENIES in part Defendants' Kahuku Motion.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, June 26, 2017.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Pac. Commercial Servs., LLC v. LVI Envtl. Servs., Inc.*, Civ. No. 16-00245 JMS-KJM, Order: (1) Granting in Part and Denying in Part Plaintiff's Amended Motion for Partial Summary Judgment, ECF No. 80; (2) Denying Defendants' Motion for Partial Summary Judgment on Counts I and II of Complaint, ECF No. 46; and (3) Granting in Part and Denying in Part Defendants' Motion for Partial Summary Judgment on Counts III, IV, and V of Complaint, ECF No. 90