IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PACIFIC COMMERCIAL SERVICES, LLC, a Hawaii limited liability company, <br><br>          Plaintiff, <br><br>    vs. <br><br> LVI ENVIRONMENTAL SERVICES, INC., nka NORTHSTAR CONTRACTING GROUP, INC., ET AL., <br><br>          Defendants. | Civ. No. 16-00245 JMS-KJM <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW |

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## **I.  INTRODUCTION**

Plaintiff Pacific Commercial Services, LLC ("PCS") filed this action

for breach of contract and unjust enrichment against Defendants LVI

Environmental Services, Inc. ("LVI") and Northstar Recovery Services, Inc.

("NRS") (collectively, "Defendants")[1] related to two projects:  the first involves

---

[1]  As indicated in the Findings to follow, LVI is now known as Northstar Contracting Group, Inc. ("NCG").  NCG and NRS are affiliates of Northstar Group Holdings, LLC.  *See* Stipulated Facts for Trial ("Stip. Facts") ¶ 6, ECF No. 140.  The court sometimes refers to Defendants collectively as LVI where the distinction is not relevant.

services relating to deactivation of the Hawaiian Electric Company's ("HECO")

Honolulu Power Plant (the "HECO Project"); the second relates to a building that

was destroyed by a 2012 fire at HECO's Kahuku Wind Farm (the "Kahuku

Project"). Stip. Facts ¶ 7. In response, LVI filed a Counterclaim for

reimbursement of certain payments. After substantial pre-trial litigation and an

order resolving some issues at the summary-judgment stage, the court conducted a

non-jury trial of the remaining issues on January 17-18, 2018, followed by post-

trial briefing.

Pursuant to Federal Rule of Civil Procedure 52(a), the court issues

these Findings of Fact ("Findings") and Conclusions of Law ("Conclusions"). To

the extent any Findings may also be deemed to be Conclusions, they shall also be

considered Conclusions. Similarly, to the extent any Conclusions may be deemed

to be Findings, they shall be considered Findings. *See In re Bubble Up Del., Inc.*,

684 F.2d 1259, 1262 (9th Cir. 1982) ("The fact that a court labels determinations

'Findings of Fact' does not make them so if they are in reality conclusions of

law.") (citation omitted).

The court finds and concludes that Plaintiff has proven by a

preponderance of the evidence that LVI breached provisions of the HECO

Subcontract and the Kahuku Subcontracts (as those terms are described in the

Findings) and that Plaintiff is entitled to damages and, separately, recovery for unjust enrichment. LVI failed to prove its Counterclaim by a preponderance of the evidence, and Plaintiff did not breach the HECO Subcontract first. Plaintiff is entitled to recover damages and restitution against Defendants in the amount of **$767,053.14**, plus prejudgment interest to be calculated based on a supplemental filing. After entry of Judgment, Plaintiff is also entitled to submit an application for reasonable attorneys' fees and costs in accordance with the court's local rules.

## II. <u>SUMMARY</u>

For convenience of the parties, the court begins by summarizing (without citations to the record) the key points, which are detailed and supported in the Findings and Conclusions that follow. The parties know the issues in dispute and the specific evidence in question, and thus will understand this summary even if a casual reader would not without first reviewing the Findings and Conclusions for context.

LVI breached the HECO Subcontract by violating its obligation to use PCS exclusively for waste transportation and disposal services for the HECO Project, such as by contracting directly with Waste Management for removal of asbestos containing material ("ACM") beginning in January of 2013. For this breach, PCS is entitled to damages of $699,044.74 for ACM work and $22,478.25

for "other non-hazardous solid waste" (performed by Tajiri), along with prejudgment interest to be determined in a supplemental filing.

But PCS failed to prove its claim for $284,978.10 in damages related to 518,142 gallons of "oily water" removed by Unitek beginning in March 2013. The scope of such work was not contemplated in the HECO Subcontract and was the subject of a change order to the main LVI-HECO Prime Contract that resulted in a much lower unit price than in potentially-applicable line items in the HECO Subcontract (i.e., 69 cents per gallon paid to Unitek versus $1.50 per gallon in a line item in the HECO Subcontract). It is entirely speculative whether PCS would have been awarded such work under a change order (and if so, at what price) even if LVI had not breached the HECO Subcontract and LVI had offered responsibility for the oily-water task to PCS. Indeed, PCS (as a waste broker) probably would not have performed the task itself and would have lost money if it had done so at 69 cents per gallon.

On the Counterclaim (and in defense of Plaintiff's claims), Defendants failed to prove that PCS breached the HECO Subcontract first when PCS charged LVI $700 per drum instead of $700 per ton for the sludge disposal. The per-drum unit price falls within the "small font" provision of Line Item 4 of Exhibit A to the HECO Subcontract. In this regard, the court accepts and relies

upon the testimony of PCS managing director Jingbo Chang, whose manner of testifying was credible and believable.  On the other hand, the testimony of Defendants' witness, former LVI branch manager Michael Moore, was evasive and inconsistent as to key points in this particular area (such as whether he knew or should have known that PCS was charging $700 per drum), and thus the court finds against Defendants on this issue.  Accordingly, Defendants' Counterclaim — seeking a refund regarding amounts LVI paid for 48 drums of waste — fails, as does their "first to breach" defense to Plaintiff's claim for breach of the HECO Subcontract.  Defendants have also failed to prove that the HECO Subcontract was terminated by operation of the other asserted Terms and Conditions of the HECO Subcontract (i.e., note 2/paragraph 17, paragraph 4, or paragraph 10).

PCS is also entitled to $13,472.51 on its unjust enrichment claim related to the HECO Project for time and materials related to mercury component disposal (as set forth in Invoice 7864-06).  It is also entitled to prejudgment interest on this amount at a per diem rate to be determined in a supplemental filing.

But PCS has not met its burden of proof as to the $25,000 it claimed under Invoice 7864-07 for "mobilization, demobilization, and waste documentation" from January 2012.  These specific tasks were not included in the scope of the HECO Subcontract (or would have been included in the unit prices),

and were not claimed until October 15, 2014 — well over two years after they would have been performed.

As for the Kahuku Project, PCS is entitled to recover for the unpaid invoices 8246-13, -14, -15, -18, and -19 (totaling $23,942.46) — invoices which are not excused by the "pay if paid" clauses. Prejudgment interest is also awarded as set forth in the table at page 58 of Plaintiff's Proposed Findings of Fact and Conclusions of Law, ECF No. 164 at 62 (and as incorporated in the Findings below).

Finally, PCS is entitled to $8,115.18 in demurrage charges outside the scope of the Kahuku Contracts, as set forth in Invoices 8246-16 and 8246-17. Prejudgment interest is awarded at the per diem rates set forth on pages 58 and 59 of Plaintiff's Proposed Findings and Conclusions, ECF No. 164 at 62-63 (and as incorporated in the Findings below).

The total amount of damages/restitution is summarized as follows:

| Basis of Award | Damages/Restitution |
|---|---|
| Count I (ACM work to Waste Management) | $ 699,044.74 |
| Count I (Non-hazardous solids to Tajiri) | $ 22,478.25 |
| Count II (Mercury component removal) | $ 13,472.51 |
| Count III (Kahuku project invoices) | $ 23,942.46 |
| Count IV (Demurrage charges) | $ 8,115.18 |
| **Total** | **$ 767,053.14** |

# III. __PROCEDURAL HISTORY__

PCS filed this lawsuit against LVI in the Circuit Court of the First Circuit, State of Hawaii, on April 19, 2016. ECF No. 1-3. The Complaint alleged claims for breach of contract and unjust enrichment with respect to the HECO Project (Counts I and II) and the Kahuku Project (Counts III, IV, and V). *Id.* LVI removed the action to this Court on May 18, 2016, based on diversity of citizenship, 28 U.S.C. § 1332. ECF Nos. 1, 6.

On May 26, 2016, LVI and NRS filed their Answer to the Complaint, and LVI asserted a Counterclaim for a refund from PCS for alleged overpayments. ECF No. 8. And on June 9, 2016, PCS filed an Answer to the Counterclaim. ECF No. 12.

On February 21, 2017, PCS filed a Motion for Partial Summary Judgment on the liability of LVI for PCS's claims pertaining to the HECO Project, ECF No. 44, and Defendants filed two Motions for Partial Summary Judgment — one as to PCS's claims pertaining to the HECO Project, ECF No. 46, and one as to PCS's claims pertaining to the Kahuku Project, ECF No. 47. On April 27, 2017, PCS filed an Amended Motion for Partial Summary Judgment, ECF No. 80, and an Amended Complaint, ECF No. 82, to correct certain allegations in the original Complaint. The court heard the Motions on May 30, 2017. ECF No. 108.

On June 26, 2017, the court entered an "Order: (1) Granting in Part and Denying in Part Plaintiff's Amended Motion for Partial Summary Judgment, ECF No. 80; (2) Denying Defendants' Motion for Partial Summary Judgment on Counts I and II of Complaint, ECF No. 46; and (3) Granting in Part and Denying in Part Defendants' Motion for Partial Summary Judgment on Counts III, IV, and V of Complaint, ECF No. 90" (the "MSJ Order"). *See* ECF No. 111; Stip. Facts ¶ 13; *Pac. Commercial Servs., LLC v. LVI Envtl. Servs., Inc.*, 2017 WL 2817883 (D. Haw. June 26, 2017).

The MSJ Order determined as a matter of law that on or about April 23, 2012, LVI and PCS entered into the HECO Subcontract — a valid and enforceable subcontract for waste transportation and disposal services. Stip. Facts ¶ 13. It determined that the HECO Subcontract bound LVI to use PCS exclusively, and was not terminable at will by LVI. 2017 WL 2817883, at *6-7. It also determined that LVI breached the HECO Subcontract by diverting work away from PCS, but left for trial the duration of the breach and the amount of damages resulting from the breach. *Id.* at *7. The MSJ Order also did not resolve issues related to PCS's claims for unjust enrichment, as well as questions regarding LVI's Counterclaim and LVI's other defenses. *Id.* at *8-10. After the MSJ Order was

issued, the parties agreed upon a modified trial process, and stipulated to certain alternative trial procedures.  *See* ECF Nos. 125 & 139.

On January 17 and 18, 2018, the court held a non-jury trial on matters remaining after the MSJ Order, and after the parties stipulated to a set of uncontested facts for trial.  *See* ECF No. 140.  Many of the remaining issues were submitted based on extensive briefing and stipulated documentary evidence, with only two witnesses — Chang for PCS, and Moore for LVI — testifying in person as to key issues at trial.  Following trial, the parties submitted proposed findings of fact and conclusions of law, along with supplemental briefing and evidence.  *See* ECF Nos. 160, 161, 163, 164, 166 & 168.

Along with the stipulated facts and trial testimony, the evidence consists of declarations, exhibits, and deposition transcripts filed in conjunction with the respective trial briefs, *see* ECF Nos. 141, 142, 143, 144, 145 & 146, although not all of the proffered exhibits were admitted into evidence.[2]  To summarize the exhibits: (1) Exhibits P-1 to P-91, P-62A to P-67A, D-1 to D-38, D-

---

[2]  The trial transcripts consist of two volumes, one for each day.  The page numbering for the first day is denoted with a prefix "1-" and similarly for the second day with a prefix "2-" (e.g., Tr. at 1-2, or Tr. at 2-1).  When indicated, line numbers of testimony are indicated by a colon (e.g., lines 3 through 6 of testimony on page 2 of volume 1 would be indicated by "Tr. at 1-2:3-6").  The transcript for January 17, 2018 is at ECF No. 157, and for January 18, 2018 is at ECF No. 158.

40 to D-42, and D-52, are in evidence; but (2) Defendant's proffered exhibits D-39 and D-43 to D-51 are not (although some of those proffered exhibits duplicate other exhibits that were admitted).[3]  Plaintiff also separately submitted deposition designations and excerpts, which, without objection, are also in evidence.  ECF No. 144.

## IV.  FINDINGS OF FACT

### A.  The Parties

1.  Plaintiff PCS is a limited liability company organized under the laws of the State of Hawaii.  Stip. Facts ¶ 1.  It provides services relating to transportation and disposal of hazardous and other waste materials.  Stip. Facts ¶ 2.  PCS has two members, Jingbo Chang ("Chang") and his wife, Wendy.  ECF No. 6 at 3; ECF No. 6-6; Chang Dep., Ex. P-2 at 10.  Both are residents of Hawaii, and at all times between the filing of the original Complaint on April 19, 2016 through the present, have been residents of Hawaii.  ECF Nos. 166-1 & 166-2.

---

[3]  In particular, all of Plaintiff's proffered exhibits at ECF Nos. 141, 142, 143 and 146 are in evidence (although some exhibits were superseded, *see* ECF Nos. 146-4 to 146-9).  Defendants' exhibits at ECF No. 145 are in evidence, along with Exhibits D-40, D-41, D-42, and D-52 at ECF No. 150.  Defendant's proffered exhibits D-39 and D-43 to D-51 were stricken.  *See* Pl.'s Statement Regarding Evidentiary Objections, ECF No. 162; *see also* Tr. at 1-7 to 1-11 (transcript of court granting Plaintiff's Motion to Strike Amended Trial Exhibit List, without prejudice, and explaining process for objections to evidence).  Most of the exhibits were formally admitted into evidence at trial, but some are in evidence because no objections were filed after being proffered with the trial briefs.  *See* Tr. at 1-10 to 1-11; *see also* ECF No. 139.

2.   Chang is the general manager and senior environmental scientist of PCS, where he has overall responsibility for the company's daily operations.  Tr. at 1-17 to 1-18.  He has a bachelor's degree in chemistry, a master's degree focusing on biochemistry, and a Ph. D. focusing on computer simulation.  *Id.* at 1-18.  He came to the United States from China in 1986.  Ex. P-2 at 11; Tr. at 1-86 to 1-87.  As the court observed while Chang testified at trial, he speaks with a heavy accent.  *See, e.g.*, Tr. at 1-25.  Although Chang demonstrated fluency in English, both conversationally and in scientific areas (both during trial testimony and as evident in the trial exhibits), some of his written emails contain minor grammatical mistakes that may affect their meaning, as discussed below.  *See, e.g.*, Ex. P-32.

3.   Defendant LVI is a corporation organized under the laws of the State of California.  Stip. Facts ¶ 3.  On or around July 2014, LVI changed its name to Northstar Contracting Group, Inc. ("NCG").  Stip. Fact ¶ 4.  NCG is organized under the laws of the State of California, with its principal place of business in California.  ECF No. 6 at 4.

4.   Defendant NRS is a corporation organized under the laws of the State of Delaware.  Stip. Facts ¶ 5.  Its principal place of business is in Austin, Texas.  ECF No. 6 at 4.

5.  NCG and NRS are affiliates of Northstar Group Holdings, LLC, which is a limited liability company organized under the laws of the State of Delaware.  Stip. Facts ¶ 6.

**B.     The HECO Project and the HECO Subcontract**

6.  The HECO Project consisted of the deconstruction of two generating units, Units 5 and 7, at HECO's power plant in downtown Honolulu. Each unit consisted of two large oil-fired boilers, condensers, and turbine generators.  The project included the abatement and demolition of those components and associated piping, cleaning of the project site, painting, and some metal fabrication.  Waste generated from the demolition and abatement work also needed to be disposed of properly by characterizing, labeling, transporting, and transferring it to appropriate facilities.  Tr. at 2-6:5-13, 2-8:8-15.

7.  In connection with its bid on the HECO Project, LVI solicited PCS to submit a subcontractor proposal for waste transportation and disposal and cleaning services relating to the HECO Project.  Stip. Facts ¶ 8.

8.  On July 23, 2011, PCS submitted to LVI a proposal to be a subcontractor for transportation and disposal of certain waste materials from the HECO Project.  Stip. Facts ¶ 9; Ex. P-6.

9.  On July 29, 2011, LVI submitted a corresponding proposal to HECO to be the prime contractor for the HECO Project.  Stip. Facts ¶ 10; Ex. P-7.

10.  LVI used PCS's proposal in preparing its proposal to HECO for the prime contract.  Stip. Facts ¶ 11.

11.  HECO accepted LVI's proposal and entered into a prime contract with LVI for the HECO Project (the "HECO Prime Contract").  Ex. P-8; Tr. at 2-16:13-16.  The HECO Prime Contract was a firm fixed-price contract.  Ex. P-8 at 2.

12.  PCS and LVI entered into a subcontract (the "HECO Subcontract") for transportation and disposal of waste for the HECO Project.  The terms of the HECO Subcontract are memorialized in the attachments to an email dated April 23, 2012 from Damariz Quezada ("Quezada") of LVI to Chang of PCS.  Exhibit P-12 is a true and correct copy of the HECO Subcontract.  Stip. Facts ¶ 13; *see also* Ex. P-11; Tr. at 1-22:7-23.

13.  Chad Maddock ("Maddock"), the LVI project manager for the HECO Project until June 2012, negotiated the HECO Subcontract with PCS. Moore, president and branch manager of LVI, was not involved in the negotiations. Tr. at 2-22:15-24, 2-118:8-22; Moore Dep., Ex. P-1 at 36:15-16, 37:3-7; Stip. Facts ¶ 20.

14. PCS's role in the HECO Project was as a waste broker. A waste broker assists the waste generator with various tasks including identifying and characterizing waste; researching and selecting a disposal facility; packaging and labeling waste; preparing waste and shipping documentation; transporting waste containers from the project site to the ocean carrier for mainland shipping; arranging for hauling by rail to final disposal facilities for disposition; and compliance with federal, state, and local regulations. *See* Trial Declaration of Jingbo Chang, ECF No. 141-1 ("Chang Decl.") ¶ 4; Tr. at 1-21:4-22.

15. As the court determined previously at summary judgment, the HECO Subcontract obligated LVI to use PCS exclusively for the waste transportation and disposal services listed in the HECO Subcontract. Stip. Facts ¶ 16.

16. As the court determined previously at summary judgment, LVI breached the HECO Subcontract by diverting work away from PCS, and was in breach as of the initial diversion beginning approximately in January 2013. MSJ Order at 18; *Pac. Commercial Servs.*, 2017 WL 2817883, at *7.

17. LVI did not invoke any of the termination provisions of the HECO Subcontract. Ex. P-1 at 67:14 to 68:5. LVI never sent a notice to PCS terminating the HECO Subcontract. *See* Ex. P-89 (LVI's Response to Plaintiff's

First Request for Admissions), Response to No. 9.  Moore believed that he did not

need to notify PCS because he thought (incorrectly) that there was no contract

between LVI and PCS.  Tr. at 2-128:23-25.

18.   In total, LVI paid PCS $526,376.04 for PCS's work on the

HECO Project.  Stip. Facts ¶ 18.

19.   In June or July 2012, Moore conducted a cost analysis of the

HECO Project and determined that the project was behind schedule and over

budget.  Tr. 2-23:22 to 2-24:6.  LVI implemented measures to increase production

and efficiency and control abatement costs.  Tr. at 2-24:7 to 2-25:3.

## C.     Diversion of Asbestos-Containing Material Work

20.   As the demolition work in the HECO Project progressed, LVI

encountered a problem with disposal of brick encasing two boilers inside Unit 5.

The bricks were surrounded by asbestos-containing insulation.  Tr. at 2-25:4-

24.

21.   PCS was LVI's subcontractor for transportation and disposal of

the Asbestos-Containing Material ("ACM").  Stip. Facts ¶ 17.

22.   In December 2012, HECO considered segregating the asbestos

from the brick waste and disposing the material as two separate waste streams —

friable (low density) ACM and non-friable (high density) ACM.  Ex. P-18 at 2; Ex. P-19 at 3.

23.  The HECO Prime Contract identifies two categories of ACM waste, i.e., friable (low density) and non-friable (high density).  Ex. P-8, Part C at PageID #5412 (Line Items 35-36), ECF No. 143-2 at 96.  In turn, the HECO Subcontract identifies the same two categories of ACM waste.  Ex. P-12 at 4 (Line Items 1-2).

24.  Friable (low density) ACM is very light material that contains asbestos and includes materials like thermal insulation, foam, ceiling tiles, or drywall.  Ex. P-1 at 71:5-9; Ex. P-3 at 36:18-24; Tr. at 1-25:21 to 1-26:3.

25.  Non-Friable (high density) ACM is very heavy material that contains asbestos and includes materials like bricks and Transite concrete pipes. Ex. P-1 at 71:8-9; Ex. P-3 at 36:14-16, 38:1-8; Tr. at 1-26:8-14.

26.  PCS charged $825 per ton for friable ACM compared to $425 per ton for non-friable ACM.  Ex. P-12 at 4.

27.  If HECO separated the waste streams, it would incur higher costs to remove friable asbestos on the surface of the non-friable materials, but it would pay less in disposal costs because it could take advantage of the cheaper rate to dispose of non-friable ACM.  Ex. P-3 at 39:6-16.  Conversely, not separating the

non-friable ACM into two waste streams would increase disposal costs but lower abatement costs. *See id.*

28. LVI self-performed the asbestos abatement work. Tr. at 2-8:1-7. LVI charged HECO on a lump sum basis for abatement. Ex. P-7 at 150-51, Line Items 15-17, 22-24; Tr. at 2-145:2-3.

29. One reason for the large cost differential for disposal between friable and non-friable ACM is the difference in weight and density. The cost of shipping ACM in a container is the same regardless of the weight of the material being shipped in the container. Tr. at 1-26:20 to 1-27:1; Ex. P-18 at 1. Friable ACM tends to be lighter than non-friable ACM but less dense, so it can fill up a container more easily. Ex. P-18 at 1-2; Ex. P-2 at 116:7-11; Chang Decl. ¶ 15.

30. HECO, not PCS, decided that ACM disposal would be charged by the ton. Tr. at 1-27:8-12. Because shipping costs are fixed, while transportation and disposal charges increase with weight, PCS's cost per ton for ACM transport and disposal is inversely related to the weight of the load. As the weight increases, the cost per ton decreases, and as the weight decreases, the cost per ton increases. As a result, PCS's profit margin increases as the weight of the load increases, and decreases as the weight of the load decreases. Tr. at 1-27:18 to 1-28:4.

31. For each category of ACM, PCS made assumptions about the weight of each load. PCS assumed that each container of friable ACM would be 10 tons, and that each container of non-friable ACM would be 20 tons. Based on those assumptions and the rates in the HECO Subcontract, PCS expected to charge $8,250 for a full container of friable ACM ($825 per ton times 10 tons) and $8,500 for a full container of non-friable ACM ($425 per ton times 20 tons). Tr. at 1-29:7 to 1-30:15.

32. Another reason for the cost differential between disposal of friable and non-friable ACM is that the two types of ACM need to be disposed of in different facilities. Friable ACM is disposed of at the landfill operated by Chemical Waste Management ("Waste Management"), and non-friable ACM goes to the Columbia Ridge landfill. Ex. P-3 at 37:3-23; Chang Decl. ¶ 16; Ex. P-18 at 1-2.

33. If a waste stream contains both friable and non-friable ACM, the entire waste stream must be classified as friable ACM because any waste containing friable ACM must go to the landfill operated by Waste Management. Ex. P-3 at 37:3 to 38:18; Tr. at 2-28:19 to 2-29:7.

34. HECO ultimately decided to dispose of the brick together with the asbestos. Tr. at 1-33:10 to 1-34:19, 2-28:11-12.

35. On December 20, 2012, Moore informed Chang: "Good news for us, HECO has agreed to not scrutinize the cleanliness of the brick and ship all as friable waste." Ex. P-20 at 2.

36. HECO's decision not to segregate the brick waste into separate waste streams and dispose of it all as friable ACM tremendously increased the quantity of this low density ACM in the HECO Project and created a more profitable situation for whoever handled this waste disposal. Chang Decl. ¶ 19; Tr. at 1-34:23 to 1-35:1. That is, HECO's decision not to segregate the brick waste, thus generating significant quantities of heavy waste to be categorized as friable ACM, dramatically increased the profitability of the ACM work.

37. HECO's decision created an unexpected increase in the volume (tonnage) of expensive, friable ACM work. *See* Tr. at 1-28:22-24; Chang Decl. ¶ 19; Ex. P-2 at 115:22 to 116:16. At the same time, HECO's decision lowered abatement costs, which LVI performed on a lump sum basis. *See supra* Finding 28.

38. After deciding not to segregate the brick waste, HECO continued to ask LVI about the differences in cost for ACM disposal, which prompted Moore to ask Chang to look into cost-savings options for ACM disposal, perhaps by

sending the ACM to a different disposal facility.  Ex. P-20 at 1-2; Ex. P-2 at

142:24 to 143:4.

39.  Chang checked alternative disposal sites and determined that the

Waste Management disposal facility was still the cheapest.  Chang informed

Moore of the results of his inquiry.  Ex. P-2 at 142:17 to 143:7; Tr. at 1-35:22 to 1-

36:12.  Chang also told Moore: "We are losing money for some of the line items,

but will be compensated with some other line items."  Ex. P-20 at 1.

40.  In a December 21, 2012 email to Chang, Moore wrote, in

pertinent part:

> I don't want PCS to eat any costs, period.  My intent was
> to have you squeeze your vendors. . . .  Again Jingbo, do
> not cut PCS costs.  This should be a good, long term
> project for both of us.

*Id.*

41.  On January 7, 2013, Moore wrote an internal email to Mark

Sampson of LVI stating, in pertinent part: "Mark — WM pricing is why our

vendor PCS is so high."  Ex. P-19 at 1.  What Moore meant was that "Waste

Management['s] pricing is why our vendor [PCS's price] is so high."  Ex. P-1 at

87:3-4; *see also* Tr. 2-131:4-11 ("PCS's price is high because its sub-vendor,

[Waste Management's] prices are high").  Moore made this statement after

obtaining a proposal from Waste Management to perform the work directly (i.e.,

not through PCS), Ex. P-22 at 1, 6-8, and conducting a cost analysis that he

testified had led him to believe that PCS was supposedly "grossly overcharging"

LVI for the ACM work.  *See* Tr. at 2-130:11 to 2-132:6.

42.  When Moore obtained Waste Management's proposal, the HECO

Project was behind schedule and budget, LVI was losing money, and it had

exhausted efforts to control production costs.  Tr. at 2-41:23 to 2-42:7.

43.  Moore gave inconsistent testimony regarding whether he

attempted to renegotiate PCS's rates for ACM work.  In a February 21, 2017

declaration, Moore stated:

> I had several conversations with Jingbo Chang of PCS
> regarding the rates that PCS was charging for hauling and
> disposing of asbestos materials and the markups that it
> was applying to the charges to its subcontractors but was
> not able to reach an agreement with PCS that brought its
> charges down for that service down to a market level that
> could be sustained for the HECO Project.

Ex. P-21 at 3, ¶ 5.  At his deposition, Moore could not recall trying to negotiate

PCS's rates for ACM work and disavowed the correctness of paragraph 5 of his

February 21, 2017 declaration.  *See* Ex P-1 at 76:7 to 77:22.  At trial, however,

Moore stood by his declaration notwithstanding that he stated it was inaccurate at

his deposition.  *See* Tr. at 2-134:2 to 2-138:7.

44. Moore did not attempt to renegotiate PCS's rates for ACM other than to ask Chang to try to find a cheaper disposal facility. Tr. at 1-37:1-4. Similarly, Moore did not ask Chang to lower PCS's rate charged to LVI for ACM disposal. Tr. at 2-133:2-4.

45. Moore testified that when he compared Waste Management's proposal with PCS's rates, he learned that PCS was charging "[m]ultiple times the market rate." Tr. at 2-39:17-24. Moore understood, however, that Waste Management, as a disposal facility, provides different services than a waste broker like PCS, and that PCS's prices are a markup of Waste Management's prices. Tr. at 2-127:14 to 2-128:3.

46. PCS's charges for its services as a waste broker are factored into its unit rates. Tr. at 1-22:4-6.

47. On January 8, 2013, Moore accepted and signed Waste Management's proposal for ACM disposal in the HECO Project. Ex. P-23 at 6.

48. LVI did not give PCS any more ACM work to handle after January 7, 2013. Ex. P-27 (Invoice 7864-04) at 2.

49. Waste Management began directly handling ACM disposal for LVI on January 17, 2013. Ex. P-72-2 at 1 (Manifest 19453).

50. On February 28, 2013, LVI and Waste Management executed a formal Subcontract Agreement for the disposal of friable ACM for an amount not to exceed $300,000.00. Stip. Facts ¶ 37; Ex. P-26.

51. In an email exchange dated February 5, 2013 Moore confirmed to Chang that LVI would be using Waste Management for asbestos disposal instead of PCS and would be "going direct on trucking" until the end of Unit 5 abatement. Stip. Facts ¶ 26; Ex. P-24. Moore did not purport to exercise any right of termination in the HECO Subcontract in sending this email. Tr. at 2-128:14 to 2-129:9.

52. On February 28, 2013, Moore followed up with Chang and asked: "Jingbo — in light of the asbestos shipping, let me know if you were still intending to service the balance of the hazmat for the project. I am pre-planning for the next couple months." Ex. P-25 at 1. Chang replied: "We want to do whatever are [sic] on the contract. We do not want to breach the contract agreement. LVI can make any decision what to do, but we honor the agreement." *Id.*; Tr. at 1-38:8 to 1-39:7.

53. Although LVI was losing money on the HECO Project as a whole, it was not losing money on line items that were charged on a unit rate basis. Ex. P-1 at 27:23-28:1; Tr. at 2-140:6-18.

54. Later, in an August 15, 2013 email, Moore told Chang: "The reason LVI chose to go direct with [Waste Management] was because there was no money being made for the light loads." Ex. P-33 at 1. "Light loads" refers to low density ACM. Ex. P-1 at 26:21 to 27:6.

55. The unit price that LVI charged HECO for ACM transportation and disposal was a markup of the unit price that PCS charged LVI. Ex. P-1 at 43:12-16, 82:22 to 83:10, 97:19 to 99:20; Tr. at 2-142:4-7.

56. LVI charged HECO $1,170 per ton for transportation and disposal of low density ACM. The price did not change throughout the HECO Project. Ex. P-7 at 152, Line Item 35; Tr. at 2-140:24 to 2-142:3.

57. In a July 23, 2013 email to Quezada, Moore estimated the profits LVI earned to date from ACM disposal after going direct to Waste Management:

> Damariz — based on what Johnny is wanting, my
> records show loads invoiced direct from WM from
> 1/9/13 to 5/16/13 total 447 tons. At 27 total loads that
> avg 16 tons x inv to heco $1,170/ton is $18,720 less cost
> of $5,174.30/container = $13,545.70 in our pocket.
>
> Total inv $505,440 less cost $139,706.10 = $365.733.90
> profit.

Ex. P-30 at 1; Ex. P-1 at 101:1 to 105:5.

58. It is readily apparent, then, that LVI increased its profits substantially by contracting directly with Waste Management, rather than using

PCS for ACM work as the HECO Subcontract requires.  Table 1 below compares

the profitability of ACM transportation and disposal for LVI when it subcontracted

with PCS versus when it contracted directly with Waste Management.

**Table 1**

| Choice of Vendor | ACM Loads | Tons | LVI Billings to HECO | Vendor Cost | LVI Profit | Average LVI profit/load |
|---|---|---|---|---|---|---|
| PCS | 34 | 536.26 | $627,424.20 | $457,833.22 | $169,590.98 | **$4,987.97** |
| WM | 97 | 1,432.08 | $1,675,533.60 | $501,907.10 | $1,173,626.50 | **$12,099.24** |

As set forth in Table 1, when LVI used PCS, it earned an average profit per load of

$4,987.97 of friable ACM.[4]  When LVI used Waste Management, its average

profit per load increased to $12,099.24 per load of friable ACM.[5]

---

[4] PCS handled 34 loads of ACM for a total of 536.26 tons.  Ex. P-62; P-62A.  PCS charged LVI $825 per ton, with a minimum charge of $8,250 per load (i.e., each load is charged a minimum of 10 tons).  *See* Ex. P-12 at 4, Line Item 1.  LVI charged HECO $1,170 per ton without a minimum charge.  *See* Ex. P-7 at 152, Line Item 35; Ex. P-87 at 4, Line Item 35; Ex. P-30 at 1.  LVI's unit price for low density ACM transportation and disposal did not change throughout the HECO Project.  *See* Tr. at 2-140:24 to 2-142:3.  Thus, LVI charged HECO $627,424.20 (536.26 tons times $1,170 per ton) and incurred costs of $457,833.22, for a profit of $169,590.98.  (The incurred costs of $457,833.22 are based on PCS's actual billings, Ex. P-62A, which, because of the minimum per-load charge, are higher than simply multiplying the number of tons by $825 per ton.)  This equals an average profit of $4,987.97 per load for LVI ($169,590.98 divided by 34 loads).

[5] Waste Management handled 97 loads of ACM for a total of 1,432.08 tons.  Ex. P-65A at 6, ECF No. 146-7 at 1; Chang Decl. ¶ 61.  Waste Management charged LVI $5,174.30 per container load.  Ex. P-26 at 2; Ex. P-30 at 1.  LVI's unit price for low density ACM transportation and disposal to HECO was $1,170 per ton.  LVI charged HECO $1,675,533.60 (1,432.08 tons times $1,170 per ton) and incurred costs of $501,907.10 ($5,174.30 per load times 97 loads), for a profit of $1,173,626.50.  This equals an average profit of $12,099.24 per load for LVI ($1,173,626.50 divided by 97 loads).

59.  It is more likely than not that LVI diverted the ACM work to Waste Management because LVI wanted to offset its losses on the lump sum work in the HECO Project by obtaining a larger share of the profits that would be generated due to HECO's decision to not segregate the brick waste — work that otherwise would have gone to PCS under the terms of the HECO Subcontract.

60.  As a measure of damages to PCS for this diversion of work from PCS to Waste Management, PCS calculates that it would have earned $699,044.75 in profits if LVI had given it the work.  PCS bases this calculation on the amount it would have charged LVI for 1432.08 tons ($1,215,885) minus the estimated costs it would have incurred for the work ($516,840.25).  *See* Ex. P-65A.  The estimated costs are based on an average of the actual costs PCS incurred for the 34 loads of ACM work that it actually handled before the diversion.  *See* Ex. P-62A.  The parties have stipulated that these calculations are correct based on the corresponding documentary evidence (e.g., waste manifests, timesheets, invoices) that are part of the record at Exhibits P-69 to P-83).  *See* ECF No. 159 (stipulation); Ex. P-64A; ECF No. 145 at 67-69.  (To be clear, however, the parties have *not* stipulated to the *fact* of any damages to PCS — only to the calculations and methodology, if the court determines that PCS is entitled to damages for such

work.  *See* ECF No. 159.)  The court accepts this stipulation and therefore does not independently calculate the amount of potential damages for this diversion.

## D.     Hazardous Solid Waste ("Sludge") Transportation and Disposal

### 1.     *The "Small Font" Provision of Item 4 of the HECO Subcontract*

61.  HECO estimated that 10 tons of hazardous solid waste would need to be transported and disposed of in the HECO Project.  Ex. P-7 at 152, Item 38; Tr. at 2-14:2-15.  The hazardous waste stream was small in quantity relative to other waste streams in the HECO Project.  *See* Ex. P-6 at 7-8, Line Items 35-45; Ex. P-7 at 152, Line Items 35-45; Tr. at 1-43:21-23.

62.  PCS's July 23, 2011 subcontract proposal to LVI for the HECO Project listed a unit price of $700 per ton for transportation and disposal of hazardous solid waste.  Ex. P-6 at 7, Line Item 38.  The proposal listed "360" as an estimated quantity.  *Id.*  Maddock sent the initial draft of the HECO Subcontract to Chang on March 23, 2012.  Ex. P-9 at 1.  Consistent with PCS's earlier proposal, the draft HECO Subcontract stated in Line Item 4 that transportation and disposal of hazardous solid waste would be charged at $700 per ton.  *Id.* at 4, Line Item 4.

63.  PCS based its unit price of $700 per ton for hazardous solids on the assumption that PCS would be given full container loads (*i.e.*, 20 tons per

container) of hazardous solid waste to handle.  Tr. at 1-40:23 to 1-41:4; 1-48:11-

16.

      64.  After submitting its bid, PCS had learned that the hazardous solid

waste would come "like sludge in drums" and in "small quantit[ies]."  Tr. at 1-

43:25 to 1-44:11.  On March 23, 2012, Chang wrote back to Maddock after

receiving the initial draft of the HECO Subcontract, commenting on Line Item 4

that the bid was based on "bulk solid at large volume."  Ex. P-10 at 1.  He was

responding because PCS had learned that the hazardous solids waste stream would

also be mixed with asbestos and liquid and would be small in volume, thus

requiring disposal at a different facility than originally thought and would be much

more expensive.  Chang Decl. ¶ 9; *see also* Tr. at 1-45:7-17.  Specifically, Chang

told Maddock as to Line Item 4:

> You may want to send an RFI to HECO.  We were
> bidding on bulk solid at large volume to send to Chem
> Waste, but looks like the waste stream is not only RCRA
> hazardous, but also mixed with asbestos and liquid too at
> small quantity at a time.  Chem Waste is not able to
> accept the [waste stream], and we have to send it to
> Clean Harbors.  Clean Harbors will charge this waste
> stream at a much higher price.

Ex. P-10 at 1.

      65.  Chang expressed concern about the $700 per ton unit price

because the cost of shipping waste, which is the major determinant of the total cost

of waste transportation and disposal, is affected by the volume of waste involved. The $700 per ton pricing assumes, among other things, shipping full containers using 20 foot or 40 foot containers (approximately 40,000 pounds of hazardous waste per container). PCS's shipping vendor, Matson, charges a minimum of 40,000 pounds regardless of the container size used. When this waste stream is in non-bulk packaging such as drums, and the quantity is small, the shipping and handling cost and disposal cost are much higher than in bulk packaging in a full container. PCS accordingly wanted to have flexibility to use the most appropriate shipping and handling method based on the characterization and volume of the waste stream. Chang Decl. ¶ 9.

66. In response to Chang's concern, Maddock proposed the following to Chang in an April 4, 2012 email:

> Leave line item 4 as is with the understanding that this pricing is for volume loads in container amounts. Smaller volume will require appropriate adjustment. Additionally, if characterization changes due to contents of material, there could be price adjustments.

Ex. P-11 at 1 (numbered item 2); *see also* Tr. at 1-47:21 to 1-49:3.

67. Chang accepted Maddock's proposal. Ex. P-11 at 1. The language in Maddock's April 4, 2012 proposal was reproduced verbatim (starting with "Smaller volume will require . . .") in small font in Line Item 4 of Exhibit A

to the HECO Subcontract (the "Small Font Provision"), next to the $700 per ton price. Ex. P-12 at 4, Line Item 4 (reproduced below). The Small Font Provision is part of the HECO Subcontract. 2017 WL 2817883, at *8.



68. Chang understood that the process for price adjustments under the Small Font Provision entails PCS sending a price quote to LVI followed by negotiations. Tr. at 1-49:18 to 1-50:5. As the MSJ Order concluded, "the provision invites further discussion or negotiations to determine the 'appropriate adjustment' — it does not allow PCS to unilaterally increase the price without LVI's consent." 2017 WL 2817883, at *8 (emphasis omitted).

## 2. *The July 2012 Load of Seven Drums*

69. On July 17, 2012, PCS arranged for the transportation and disposal of sludge and sediment mixed with lead and asbestos in connection with the HECO Project. Stip. Facts ¶ 19; Ex. P-14 at 4; Ex. P-15. This load of sludge and sediment came in seven drums and contained liquid. Tr. at 1-52:21 to 1-53:8. The billing and payment for this task led to (at least initial) confusion, and is an important part of this case.

70.  Because the sludge was semi-solid and contained liquid, it was packed into drums, which is considered non-bulk packaging.  Ex. P-2 at 58:1-20; Tr. at 1-53:7-19.

71.  On August 28, 2012, Moore sent an email to Chang (and others) with a subject line "Re: heco waste and manifests."  Ex. P-13 at 2.  It stated in part:

> Jingbo — manifests received for initial drums of sludge shipped in June [sic – July].  However, there are no drum weights and that is how we invoice.  Let me know if you have weights per drum.

*Id.*

72.  On August 29, 2012, Chang sent a reply email (consistent with the Small Font Provision of the HECO Subcontract) to Moore stating:

> [Normally] the disposal facility charge by drum for waste in drum (non-bulk), not by weight.  As far as the weight on the manifest is less than 10% difference, they don't change it to the actual weight.  We have to provide change order to HECO for those drums.  Our price was based on large quantity and can be shipped in full 40' container to the one disposal facility, but so far we got only 7 drums.  Bulk and non-bulk price is much different.  Thanks.

Ex. P-13 at 1.

73.  The next day, Moore replied: "Let me know the cost difference.  Thanks."  *Id.*  At his deposition, Moore explained what he meant by his response

— "[a]pparently I was trying to help the guy out with moving a container." Ex. P-1 at 53:16-17.

74. On September 4, 2012, Chang responded to Moore: "The price for transportation and disposal of 55-gallon drums of sludge/sediment with asbestos and heavy metals is $750/drum." Ex. P-13 at 1.

75. Moore did not respond to Chang's September 4, 2012 email quoting the non-bulk price of $750 per drum. Chang understood this to mean that the $750 per drum price was acceptable to LVI. Tr. at 1-57:2-6; Ex. P-2 at 65:8-17.

76. Moore understood that the price per drum far exceeds that of price per ton given the volume of waste. Tr. at 2-81:17-21. Moore also understood that PCS needed to ship a full container based on the pricing in Line Item 4, and because the July 2012 load consisted of a small quantity of drums (not a full container), PCS would lose money on the load. *See* Ex. P-1 at 53:6-56:17.

77. On September 18, 2012, Chang sent an email to Moore attaching an initial (draft) version of Invoice 7864-01. Stip. Facts ¶ 20; Ex. P-14. Chang sent this version of Invoice 7864-01 to LVI for its review and to provide an opportunity to make objections or revisions before the invoice is finalized. *See* Tr. at 1-51:2 to 1-52:10.

78.  The initial version of Invoice 7864-01 that Chang sent to Moore on September 18, 2012 included, among other items, a charge of $5,250 for "Transportation and Disposal of sludge/sediment with lead and asbestos, manifest No 009256911JJK."  With respect to this charge, the number "7" was listed in the "Quantity" column of the invoice and "750.00" was listed in the "Price" column.  Ex. P-14 at 4.  This was the seven drums of sludge and sediment that was the subject of the email discussion between Moore and Chang from August 28 to September 4, 2012.  Ex. P-13 at 1-2.

79.  The manifest form corresponding to the seven drums of sludge and sediment was not included with the draft invoice, but PCS had sent a copy of it to LVI earlier.  Tr. at 1-114:6-19.

80.  PCS uses Intuit Quickbooks accounting software to prepare its invoices.  Quickbooks' invoice format does not have a column for unit of measure.  Tr. at 1-57:18 to 1-58:21; Chang Rebuttal Decl. (Dec. 27, 2017), ECF No. 146-1 ¶ 3.  None of the invoices PCS issued in the HECO Project lists the unit of measure in the "Quantity" Column.  *See, e.g.*, Ex. P-14; Ex. P-88; Ex. P-27; Ex. P-28; Ex. P-39; Ex. P-41.

81.  Moore has never told PCS that the format of its invoices was confusing to read, or complained that its invoices did not list the unit of measurement for quantity.  Tr. at 2-154:1-7.

82.  On October 9, 2012, Moore sent an email to Chang stating:

> Amounts charged in Invoice 7864-01 were approved with exception to the sludge/sediment.  Unit price should be $700/ton per PCS pricing sheet item 38.  You billed $750.  Please revise last sheet of invoice only.

Stip. Facts ¶ 21; Ex. P-16.  Moore was apparently quoting from PCS's original bid proposal for the HECO Subcontract, not from the actual HECO Subcontract, because he thought there was no signed subcontract.  Tr. at 2-75:9-23.

83.  Chang did not read Moore's October 9, 2012 email very carefully.  Ex. P-2 at 72:3-9, 74:12-15; Tr. at 1-59:24 to 1-60:12.  As for the drums, Chang believed Moore agreed with changing the $700 per ton price stated in the HECO Subcontract to a price more appropriate for non-bulk quantities.  *See* Rebuttal Chang Decl. ¶ 4, ECF 146-1.

84.  Before Chang read Moore's October 9, 2012 email, he had a telephone conversation with Moore.  Moore told Chang that the initial version of Invoice 7864-01 was fine except that the last line item should be changed from "750" to "700."  Tr. at 1-60:1 to 1-61:5.  They did not specifically discuss charging by tons versus by drums.  Tr. at 2-160:3-6.

85. Chang understood Moore's instruction to change "750" to "700" to refer to per drum pricing because Chang had quoted $750 per drum to him and he did not ask for a change in the quantity. That is, Chang thought that Moore was reducing the price from $750 to $700 per drum (and not $750 to $700 per ton). Tr. at 1-59:12 to 1-60:12, 1-61:7-9.

86. On October 9, 2012, Chang sent an email to Moore forwarding a revised version of Invoice 7864-01. Stip. Facts ¶ 22; Ex. P-16. The revised version of Invoice 7864-01 charged the seven drums of sludge and sediment at $700 per drum instead of $750 per drum as in the initial invoice, for a revised charge of $4,900. Like the initial version of the invoice, the description of the work in the revised invoice referenced manifest no. 009256911JJK. Ex. P-16 at 5.

87. The $700 per drum price in the revised Invoice 7864-01 was close to the market price and was not based on any specific percentage of cost mark-up nor designed to achieve any specific profit margin. Tr. at 1-62:3-9. Under PCS's standard rate schedule for 2012, PCS would have charged the aggregate rate of $750 per drum to handle the load of hazardous solids described in Invoice 7864-01. *See* Rebuttal Chang Decl. ¶ 5, ECF No. 146-1; Ex. P-79 at 2 (Price Code "SS02" listing $625 per drum for disposal and $125 per drum for transportation).

88. Chang credibly testified that he was not attempting to fool LVI into paying the $700 per drum price. He testified "I want to maintain good relations with any customer. You know, I try to fool a customer, that's — that will be stupid." Tr. at 1-61:17-22.

89. Moore is familiar with waste manifest forms and their format, knows how to read them, and regularly read such forms in his work at LVI. Tr. at 2-150:5-15. Moore is aware that manifests typically state the weight and quantity of drums. Ex. P-1 at 52:17 to 53:5.

90. PCS's general practice is to send manifests along with its invoices to LVI. PCS and LVI would receive a copy of the manifest when PCS picks up a waste load. LVI can ask PCS for a copy of a manifest if LVI did not receive it. Tr. at 1-66:22 to 1-67:23, 1-114:20-22, 2-151:9-17. Moore confirmed that it would not be difficult to obtain a copy of a manifest. Tr. at 2-156:22 to 2-157:2. The "Container" box on the waste manifest form (Item 10) would not be left blank on the copy of the manifest available at the time of pickup. Tr. at 2-153:9-25.

91. Moore's standard practice is to personally conduct a thorough review of every subcontractor invoice. Tr. at 2-146:11 to 2-147:5. Moore would verify the cost, quantities, and prices billed based on the manifests, unit pricing sheets, and the schedule. Ex. P-1 at 14:6-11, 15:2-6; Tr. at 2-149:13 to 150:4.

Moore would review the pricing again when LVI bills HECO to catch inconsistencies between the price a subcontractor charges LVI and the amount LVI bills HECO. Ex. P-1 at 15:20-16:9. An LVI administrator would also conduct a review of every invoice that goes to HECO to ensure there is consistency between what LVI believes is the correct price from the subcontractor and what it bills HECO. *Id.* at 16:10-17:5.

92. The number in the "Quantity" column of Invoice 7864-01, the unit price in the "Price" column, and the dollar figure in the "Amount" column provided the information needed to determine that PCS was charging by the drum for the hazardous solids work in Invoice 7864-01. Ex. P-16 at 5.

93. On manifest 009256911JJK (referenced in the invoices), the number "007" is printed in the "No." column of Box 10 (labeled "Containers") and the notation "DM" is printed in the "Type" column. Ex. P-15. This information on the manifest discloses that the waste stream was packed in seven "DM" or drums. Ex. P-2 at 70:13-71:10.

94. Moore testified that he could not specifically recall how carefully he reviewed Invoice 7864-01, but when reviewing it he would have focused on the last item regarding the unit pricing because that was the item he had identified as problematic in the initial version of the invoice. Tr. at 2-157:14-22.

95.  In an email dated October 10, 2012 to Quezada, Moore approved revised Invoice 7864-01 for payment.  Stip. Facts ¶ 24; Ex. P-17 at 6.  LVI paid the revised Invoice 7864-01 in full by check dated November 16, 2012.  Stip. Facts ¶ 25; Ex. P-17 at 2.

96.  Moore testified that he thought that the revised Invoice 7864-01 charged by tons instead of by drum, believing that it reflected seven tons worth of drums.  Tr. at 2-73:14-20.  He assumed that seven meant tons and not drums, but he did not verify his assumption.  Tr. at 2-158:6-11.

97.  Moore testified that he thought Chang had quoted him a price of $750 per ton in the email exchange on September 4, 2012, rather than $750 per drum as Chang's email stated.  Tr. at 2-82:3-18, 2-158:1 to 2-159:11.  This testimony is not credible.  Moore's testimony was equivocal — he initially testified that "it was *probably* my understanding per ton."  Tr. at 2-82:5 (emphasis added).  And Moore was asking for a cost difference in response to Chang's concern that the small quantity of drums did not fill a container.  Chang had specifically explained to Moore that pricing per drum is more expensive than pricing per ton, and Moore understood PCS was in a "bind" in handling a small quantity of hazardous solids at a $700 per ton rate, and was "trying to help [Chang] out with moving a container."  Ex. P-1 at 53:12-17.  Moore's regular practice of thoroughly

reviewing subcontractor invoices and supporting documentation would have made it clear that, when PCS submitted the revised invoice, PCS was charging $750 per drum per Chang's earlier price quote. Moore had the information and experience necessary to know that the number "007" in the "Quantity" column referred to drums. And his review of the revised version of the invoice would have focused on the issue because he had specifically flagged the pricing of that item in an email exchange.

98. Moore testified that he learned "maybe a couple billing cycles later" after receiving revised Invoice 7864-01 in October 2012 that the invoice referred to seven drums instead of seven tons. Tr. at 2-73:23 to 2-74:13. A billing cycle is 30 days. Tr. at 2-168:16-17. He thus knew at least by December 2012 that PCS billed $700 per drum. Tr. at 2-169:6-16. Moore, however, did not question Chang about this alleged discrepancy, or request a credit from PCS for an overpayment, until eight months later, when Moore sent an August 14, 2013 email seeking a credit in conjunction with a similar dispute. Ex. P-31.

99. At his deposition, Moore could not recall why he waited so long before making an issue of the alleged overpayment of revised Invoice 7864-01. Ex. P-1 at 60:3 to 62:5. But at trial, Moore testified that he did not ask for a refund or credit from PCS when he first discovered the alleged overpayment because LVI

was in the midst of change order negotiations and "a $4900 charge frankly wasn't at the top of [his] list to pursue." Tr. at 2-84:9-14.

100. The preponderance of the credible evidence demonstrates that, when LVI paid the revised version of Invoice 7864-01, Moore knew or should have known that PCS was charging $700 per drum for the seven drums of sludge and sediment. The charge of $700 per drum falls within the Small Font Provision of the HECO Subcontract. And, regardless, Moore knew at least by December of 2012 that PCS was charging LVI at a rate of $700 per drum and not $700 per ton for the hazardous solid/semisolid waste. Tr. at 2-169:6-16.

### 3. *The April 2013 Load of 41 Drums*

101. On April 9, 2013, PCS arranged for the transportation and disposal of 41 drums of sludge and sediment in connection with the HECO Project. Stip. Facts ¶ 27. Moore or a superintendent ordered the pickup of the 41 drums. Either way, Moore would have known about the order. Tr. at 2-161:10 to 2-162:9. Forty-one drums of sludge and sediment is a non-bulk quantity. Tr. at 1-68:10-14.

102. On May 4, 2013, Chang sent an email to Moore attaching Invoice 7864-05, which was for service rendered by PCS on April 9, 2013 described as: "Transportation and Disposal of sludge/sediment with lead and asbestos, manifest No. 008801608JJK from HECO Honolulu Plant." Stip. Facts

¶ 28; Ex. P-28 at 2. The "Quantity" column of the invoice stated "41." Ex. P-28 at 2.

103. PCS charged $28,700 for the 41 drums at the rate of $700 per drum. *Id.* PCS charged $700 per drum because Chang understood that LVI's prior payment of Invoice 7864-01 (regarding the seven drums) indicated LVI's agreement to that price per drum for non-bulk quantities of hazardous solids, and PCS was trying to be consistent in its pricing. It is not PCS's practice to negotiate the rate for each load of waste it handles. Ex. P-2 at 77:2 to 80:5; 141:7-23; Tr. at 1-68:22 to 1-69:6, 1-70:4-15.

104. The number in the "Quantity" column of Invoice 7864-05, the unit price in the "Price" column, and the dollar figure in the "Amount" column provided LVI with the information it needed to determine that PCS was charging by the drum for the hazardous solids work in Invoice 7864-05. Ex. P-28 at 2.

105. Based on the description of the waste in Invoice 7864-05 as "sludge/sediment with lead and asbestos," Moore knew or should have known that the waste was packaged in drums. Tr. at 2-66:19 to 2-68:9.

106. If the load of sludge and sediment that PCS handled in April 2013 had been 41 tons instead of 41 drums, it would have filled two shipping containers because a full container weighs approximately 20 tons. Tr. at 1-55:25 to

1-56:10, 1-126:2-7.  If a waste load had two containers, Moore would have expected to see two manifests, but only one was listed on the invoice.  Tr. at 2-165:13-18.

107.  A 55-gallon drum weighs approximately 500 pounds (or a quarter ton).  Forty-one drums therefore would have weighed approximately 10.25 tons.  Tr. at 1-69:15-20, 2-57:23 to 2-58:7.

108.  It would have cost PCS approximately $14,000 to ship a full container.  If PCS applied the unit price of $700 per ton for the load of 41 drums, PCS would have charged LVI $7,175 for the load (10.25 tons time $700 per ton).  Tr. at 1-69:21 to 1-70:3.

109.  On June 6, 2013, Moore approved Invoice 7864-05 for payment.  Stip. Facts ¶ 29; Ex. P-29 at 3.  And LVI paid Invoice 7864-05 in full by check in the amount of $28,700 dated June 12, 2013.  Stip. Facts ¶ 30; Ex. P-29 at 1.

110.  Moore testified that, when LVI paid the invoice, he thought the "41" referred to tons not drums.  Tr. at 2-52:12-16, 2-59:24-25 to 2-60:1.  He testified that "[i]n layman's terms, I screwed up and approved an invoice that had the incorrect unit of measure."  Tr. at 2-63:6-7.

111.  At his deposition, Moore did not remember when he noticed the alleged overpayment of Invoices 7864-01 and 7864-05 except that it was after the

invoices had been paid.  Ex. P-1 at 46:17-25, 57:7-9.  At trial, Moore explained that he became aware of the alleged overpayments when "the invoice was kicked back" from a HECO consultant.  Tr. at 2-60:9-11.

112.  On June 14, 2013 — eight days after Moore approved payment of Invoice 7864-05 and two days after LVI paid the invoice — Moore sent an email to Chang with the subject line: "HECO – 41 drums sediment."  In the email, Moore states: "Hi Jingbo – checking on disposition and signed manifest status for these drums.  Thanks."  Ex. D-1 at 2.

113.  Chang responded about 10 minutes after Moore's email was sent, stating: "See attached.  Thanks."  *Id.* at 1.  Chang had attached a manifest to the email.  Tr. at 2-62: 15-17.  Moore responded shortly thereafter, asking Chang: "Was there a weight ticket?  Client's asking how weight was determined.  Does facility weigh it?"  Ex. D-1 at 1.  Chang responded "For[] drum waste, the disposal facility charge by drum not by weight.  If the weight difference is within 10%, they don't change the estimate weight."  *Id.*

114.  Moore testified at his deposition that LVI would not pay a subcontractor before receiving money from HECO that could cover the subcontractor's invoice, that it "would always get paid from HECO first before it paid the sub," and that he was not aware of any deviations from that practice.  Ex.

P-1 at 46:8-16.  At trial, Moore testified that he vaguely recalled deviations "on a small scale" that happened "very rarely."  Tr. at 2-122:6-24.

115.   There are numerous inconsistencies in Moore's testimony about how and when he discovered the alleged overpayment of Invoice 7864-05 such that his testimony in this regard is not credible:

- At trial, Moore testified that he discovered the alleged overpayment of Invoice 7864-05 when he billed HECO for the work on the 41 drums of sludge and sediment and HECO "kicked back" the invoice.  Tr. at 2-60:2-11, 2-166:14-24. In this regard, Moore testified that he billed HECO for $10,000 using tons as the unit of measurement.  Tr. at 2-64:23-25.  The unit rate for hazardous solids in the HECO Prime Contract was $990 per ton.  Tr. at 2-55:20-23; 2-56:14-19.  At that rate, a $10,000 charge corresponds to approximately 10 tons of hazardous solids, which is the weight of the 41 drums.  Tr. at 2-57:17 to 58:7.  At times, he testified that he put down 10 tons in the bill to HECO.  Tr. at 2-59:3-6.  But Moore could not adequately explain how he knew to charge for 10 tons given that, before billing HECO, he thought the "41" in the PCS invoice referred to tons instead of drums. Tr. at 2-58:18 to 2-60:11, 2-62:21 to 2-63:25, 2-64:17 to 2-65:20.  Moore later testified that he billed HECO for 41 tons of sludge and sediment.  *See* Tr. at 2-

65:22-23, 2-167:1-14.  The charge for 41 tons at the rate of $990 per ton would have been $40,590, not $10,000 as stated by Moore.

- Moore testified on direct examination that HECO "kicked back" his bill *prior* to his email exchange with Chang on June 14, 2013.  Tr. at 2-65:22 to 2-66:2.  On redirect examination, Moore testified that he had not billed HECO as of the June 14, 2013 email exchange, and that the billing would have occurred at the end of the month.  Tr. at 2-190:1-22.  The reason Moore sent the June 14, 2013 email to Chang was to obtain a copy of the fully executed manifest, which he needed to bill HECO.  Tr. at 2-190:23 to 2-191:25; Ex. D-1.  Thus, Moore could not have billed HECO before his email exchange with Chang on June 14, 2013, and correlatively, it is unclear how HECO could have "kicked back" the bill before that date.

- Moore testified that HECO did not say anything about the quantity of materials in his invoice to them for the 41 drums.  Tr. at 2-66:3-6.  Shortly later, Moore testified that HECO questioned the quantity.  Tr. at 2-66:11-12.

- Moore testified that HECO questioned the total amount in the invoice.  Tr. at 2-66:7-10.  If Moore billed approximately $10,000 for 41 tons as he testified that he did, the invoice total would not have been questionable because it would have been correct.

116.  Even if Moore initially thought the "41" meant tons instead of drums, the preponderance of the credible evidence establishes that he knew, or should have known, it meant drums when the invoice for the 41 drums was paid. Moore knew that the waste was packaged in drums because Invoice 7864-05 referenced "sludge/sediment" in the description.  Moore knew that PCS previously charged by the drum (at $700 per drum) for the seven drums of similar waste.  The invoice provided the information needed to determine that PCS was charging by the drum.  The manifest for the load, which the invoice referenced, confirmed that "41" referred to drums.  Moreover, if the load had consisted of 41 tons, Moore would have expected to see two manifests because 41 tons would fill two containers.  A cursory review of the invoice (which contains just a single item) would have resolved any ambiguity about the quantity.  Moore's awareness that "41" meant drums is confirmed by Moore's email to Chang sent two days after LVI paid Invoice 7864-05 with the subject line: "HECO — 41 drums sediment."

### 4.     *LVI's Demand for Credit from PCS*

117.  On August 14, 2013, Moore sent an email to Chang requesting a credit for Invoices 7864-01 and 7864-05, in which LVI claimed PCS incorrectly billed transportation and disposal of hazardous solids at $700 per drum instead of $700 per ton.  Stip. Facts ¶ 31; Ex. P-31.

118.  On August 14, 2013, Chang replied to Moore's request for a credit with an email stating:

> The $700/ton is based on 360 tons bulk solid (e.g. supersacks or triwall boxes).  It is impossible for hazardous waste drums disposal to be charged at $700/ton.
>
> Mike, you can see it here.  It is very difficult to bid.  Some items are right and some items are under and some items are over.  LVI took away the items are better than estimated.  When you bid job, you just have to take risk.  When the gravy is taken away, all other prices are not valid anymore.  But you can justify the drum price to HECO.  When we bid the disposal we are based on solid on bulk containers and shipped directly to Chem Waste in Oregon in full containers.  Hope you understand it.  Thanks.

Stip. Facts ¶ 32; Ex. P-32 at 1.  These comments are consistent with the negotiations that led to the Small Font Provision.

119.  In his August 14, 2013 email to Moore, Chang conveyed to Moore that PCS might have been able to issue LVI a credit based on the bulk price of $700 per ton and absorb the loss if LVI had not taken away the more profitable work (i.e., ACM disposal).  Ex. P-2 at 118:25 to 120:1; 132:24 to 133:21; *see also* Ex. P-38 at 1.  Chang was emotionally upset when he sent this email and was trying to explain the difficulty of adhering to the $700 per ton price in light of LVI taking away the profitable ACM work.  Tr. at 1-75:2-12.

120.  In stating that "all other prices are not valid anymore," Chang was not repudiating all of the prices in the HECO Subcontract.  Ex. P-2 at 123:7-21; Tr. at 1-75:13-15.  Rather, PCS would have honored the prices in the HECO Subcontract if LVI had given PCS more work after this exchange, which LVI did not.  Tr. at 1-75:16-22.

121.  Chang's statement that it is "impossible for hazardous waste drums disposal to be charged at $700/ton" referred to the "impossibility" of charging $700 per ton, not the "impossibility" of packaging hazardous waste in drums.  Tr. at 1-74:19 to 1-75:1.

122.  On August 15, 2013, Moore responded to Chang's August 14, 2013 email, stating:

> I understand your position on the hauling.  However, the reason each line item for disposal was separate was to enable each to be a stand alone price in the event the quantities varied or specific items were deleted from the contract.  No one price should have been assumed to carry the others.  The reason LVI chose to go direct with WM was because there was no money being made for the light loads.  LVI was not made aware at the time of bid the minimum tonnage requirements.
>
> There is still ample work to be done and think it unfortunate if we cannot work together.  I am simply asking for a credit for monies that were overpaid as a matter of error and hope you honor the previously agreed-to price.

Your consideration is appreciated.

Stip. Facts ¶ 33; Ex. P-33 at 1.

123. When Moore sent the August 15, 2013 email to Chang, LVI had

not made a decision about whether to give PCS more work for the HECO Project if

the credit had been issued as requested. The decision remained open while the

dispute over the credit was unresolved. Tr. at 2-173:8 to 2-174:3.

124. On August 15, 2013, Chang further replied to Moore's August

14, 2013 email requesting a credit for Invoices 7864-01 and 7864-05, stating:

> I think that you shall get a change order for the drums of
> semi-liquid from HECO. The item 38 is for hazardous
> solids. The drums shall fall into at least item 42. Semi
> liquid waste price shall be higher than that. I think that
> when we picked up the first 7 drums, I discussed it with
> you.

Stip. Facts ¶ 34; Ex. P-34 at 1.

125. In a letter dated August 28, 2013, LVI formally demanded a

$25,200 credit for Invoice 7864-01 and Invoice 7864-05. LVI demanded that the

credit be issued by September 16, 2013. Stip. Facts ¶ 35; Ex. P-37.

126. When Moore sent the August 28, 2013 demand letter, his

intention was to stop using PCS if he did not receive a favorable response from

PCS.  Tr. at 2-89:6-11.  Moore testified at trial that LVI had not decided whether to continue using PCS for the HECO Project before the September 16, 2013 deadline given in the letter.  Tr. at 2-175:1-9.

127.  But on August 21, 2013 — before LVI sent the formal demand letter to PCS — Moore told a different potential subcontractor that he had "finally convinced heco not to use pcs for the remainder of this project."  Ex. P-36 at 3; Tr. at 2-176:1-25.  Moore was negotiating with Cameron Chemical Corporation ("Cameron") for mercury disposal work listed on a PCS manifest, and within the scope of PCS's HECO Subcontract.  Ex. P-36 at 3; Tr. 2-177:17-19.

128.  A Cameron representative asked Moore "How much was [PCS] charging you for this, I want to save you $$$."  Ex. P-36 at 2.  Moore responded "$4,000/ton and this is our first round.  Attached bid form includes his pricing. You didn't see this though."  *Id.* at 1-2.

129.  In a letter to LVI dated September 25, 2013, PCS denied LVI's demand for a credit.  Stip. Facts ¶ 36; Ex. P-40.

5.    *LVI's Arguments Challenging the Agreement on Price*

130.  LVI argues that there was no valid agreement to modify the unit price of $700 per ton for hazardous solids to $700 per drum because the change order procedures in certain provisions of the HECO Subcontract were not

followed.  The provisions relied upon by LVI are contained in the standard Terms and Conditions drafted by LVI that were attached to and made part of the HECO Subcontract ("Terms and Conditions"), or in notes to Exhibit A to the HECO Subcontract.  Exhibit A is reproduced in full on the next page.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///



## EXHIBIT A

| ITEM | DESCRIPTION | Scope of Work to be Performed by PCS | PRICE | UOM |
|------|-------------|--------------------------------------|-------|-----|
| 1 | ACM: Low density (TSI, surfacing material, etc.) | ACM: Low density (TSI, surfacing material etc.): providing 40-foot Marine Containers, loading, transportation and disposal in Mainland, excluding packaging, assuming that minimum weight of 10 tons per 40-yard. | $ 825.00 | Ton |
| 2 | ACM: High density (refractory brick, cement, etc.) | ACM: High density (refractory brick, cement, etc.):providing 40-foot Marine Containers, loading, transportation and disposal in Mainland, excluding packaging. | $ 425.00 | Ton |
| 3 | ACM (unabated equipment) | ACM (unabated equipment): disposal at PVT. | $ 250.00 | Ton |
| 4 | Hazardous Solids (bricks, sediments, sludge, LBP) | Hazardous Solids (bricks, sediments, sludge, LBP): providing 40-foot Marine Containers, loading, transportation and disposal in Mainland, excluding packaging.  ***Smaller volume will require appropriate adjustment. Additionally, if characterization changes due to contents of material, there could be price adjustments. | $ 700.00 | Ton |
| 5 | Universal Wastes (batteries, ballasts, lamps, mercury equipment) | Universal Wastes (batteries, ballasts, lamps, mercury equipment) | $ 4,000.00 | Ton |
| 6 | Non-hazardous Solid Wastes (bricks, Concrete, wood, debris) | Non-hazardous Solid Wastes (bricks, concrete, wood, debris) | $ 150.00 | Ton |
| 7 | Liquids, petroleum containing | Liquids, petroleum containing: including pumping, transportation and disposal from temporary storage. | $ 1.50 | Gal |
| 8 | Liquids, chromium containing | Liquids, chromium containing: transportation and disposal, excluding packaging. | $ 10.00 | Gal |
| 9 | Liquids, other (specify) | Liquids, other: non-hazardous sump sludge: transportation and disposal | $ 2.50 | Gal |
| 10 | Oils < 2 ppm PCB | Oils < 2 ppm PCB: including pumping, transportation and disposal from temporary storage. | $ 1.50 | Gal |
| 11 | Oils > 2 ppm PCB | Oils > 2 ppm PCB: transportation and disposal , excluding packaging. | $ 11.00 | Gal |
| 12 | Documentation | Documentation, Submittals and Close-Out Documents | $ 5,000.00 | ea |

1) Damage caused by LVI are LVI's responsibility. We would only look to PCS for damages caused by PCS personnel, equipment or subcontractors.

2) Notification should be made within 3 "business days" if there are additional costs to the unit prices listed.

3) PCS will be given every opportunity to correct defaults if encountered. As this project has very specific requirements on what times and days we can move equipment and materials due to the cruise ship activities. PCS must notify LVI of conflicts that would prevent them from moving loads within the specified window. If PCS is issued a written notice, we will hold to the 3 days excluding boat days to remedy.

4) LVI will compensate PCS for incurred costs if terminated for convenience. Unit pricing within this PO should eliminate concerns on this.

5) PCS must provide notification of who the work is subcontracted to so that LVI can notify HECO for access.

Subcontractor_____  LVI _____
                initial              initial

### a.    Note 2 and Paragraph 17

131.  Note 2 in Exhibit A to the HECO Subcontract provides: "Notification should be made within 3 'business days' if there are additional costs to the unit prices listed."  Ex. P-12 at 4.  Note 2 was negotiated separately, and is listed, along with other notes, at the bottom of the Exhibit A.

132.  Paragraph 17 of the standard Terms and Conditions provides in part:  "All claims for additional costs shall be submitted to the Contractor within three (3) days of the basis for the claim becoming apparent, or as otherwise required so that the Contractor may comply in the manner provided in the Contract Documents for like claims by the Contractor."  *Id.* at 7.  It is part of the Terms and Conditions included in the draft contract that Maddock initially sent to Chang on March 23, 2012.  Ex. P-9 at 7-8.  Note 2 and Paragraph 17 relate to the same subject matter.

133.  Note 2 was the result of negotiations over Paragraph 17 of the Terms and Conditions.  After Chang received the first draft of the HECO Subcontract from Maddock, Chang asked PCS's risk manager, Kevin Lam, to review and comment on the draft.  Among other things, Lam commented: "Paragraph 17 – Note that contractor requires PCS to submit additional costs to contractor within 3 days or it will be deemed waived by PCS.  Is 3 days standard?

I would suggest at least changing 3 'business' days.'" Ex. P-11 at 2. Chang

forwarded Lam's comments to Maddock. *Id.* Maddock replied: "As these are unit

prices, I wouldn't anticipate additional costs being an issue. However, notification

should be made within the 3 'business days' if there are additional costs (Paragraph

17)." Ex. P-11 at 1. The second sentence of that statement was incorporated into

HECO Subcontract as Note 2. Ex. P-12 at 4.

       134. The "additional costs" language in Note 2 applies to changes in

the total contract amount. The HECO Subcontract has unit pricing, not a fixed

lump sum price. Tr. at 1-23:8 to 1-24:5. Note 2 is not applicable to unit prices.

*See* Tr. at 1-108:7-21. That is, the "additional costs" language in Note 2 and

Paragraph 17 refer to cost categories (*e.g.*, special packaging fees that are expressly

excluded from the unit price in Line Item 4 of the HECO Subcontract) different

from those under the unit rate or costs in addition to the total contract price.

      135. A change to the unit price is not an "additional cost" within the

meaning of Note 2 and Paragraph 17. PCS and LVI agreed to modify the unit rate

itself, not add on cost components different from those accounted for in the unit

rate. Accordingly, the price change from $700 per ton to $700 per drum was not

an "additional cost" subject to the notification procedure set forth in Note 2.

### b.     Paragraph 10

136.  Paragraph 10 of the HECO Subcontract's Standard Terms and

Conditions provides, in pertinent part:

> Subcontractor shall make all ***changes from the original plans and specifications*** when ordered to do so by Contractor without nullifying the original Subcontract/Purchase Order, and shall promptly submit to Contractor its Change Order proposal before performing these changes.

Ex. P-12 at 6 (emphasis added).

137.  The "plans and specifications" language in paragraph 10 refers

to plans and specifications for construction work, not for waste disposal.  A change

in the unit price for transportation and disposal of waste does not constitute a

change in "plans and specifications" within the meaning of paragraph 10.

### c.     Paragraph 4

138.  Paragraph 4 of the HECO Subcontract's Standard Terms and

Conditions provides:

> Requested revisions to Subcontractor's Contract Price are not to be included in its billings until Subcontractor receives Contractor's signed Change Order.  Authorized charges must be shown, but not billed separately and are to be added or deducted from the Contract Price.

Ex. P-12 at 6.

139.  The reference to "the Contract Price" in paragraph 4 signals that the provision applies to changes to the fixed price of the contract, if there is one. As the HECO Subcontract had unit prices rather than a fixed contract price, paragraph 4 does not apply.

## E.    Diversion of Other Waste Streams

140.  After filing this lawsuit, PCS learned that LVI used other vendors or subcontractors for work, in addition to ACM work, that it contends are diversions fitting within line items in the HECO Subcontract.  Tr. at 1-39:8 to 1-40:2.  It seeks recovery for two diversions —"oily wastewater" and "non-hazardous solid waste."

### 1.    *"Oily Wastewater" Handled by Unitek Solvent Services, Inc. ("Unitek")*

141.  PCS is claiming $284,978.10 for lost profits on work performed by Unitek in connection with removal and disposal of "oily wastewater" pursuant to a subcontract that LVI formally entered into with Unitek on May 17, 2013, Ex. P-35, although Unitek began disposing of oily wastewater as early as March 2013, *see, e.g.*, Ex. P-75-1; Ex. P-64A (stipulated amount of PCS's damage claim for the HECO Project).  This work ultimately consisted of disposal of approximately 518,000 gallons, for which LVI paid Unitek a total of $376,987.80.  Tr. 2-93:4-11; Ex. P-83.  PCS is claiming that LVI should have allowed PCS to perform that work

at the rate of $1.50 per gallon or $2.50 per gallon under existing line items in its HECO Subcontract.

142. PCS's subcontract proposal to LVI contemplated 10,000 gallons of "Liquids, petroleum containing," and 500 gallons of "Liquids, other specify." Ex. P-6 at 7-8, line items 41 & 43; Tr. at 1-157:13-22. When it submitted its proposal and entered into the HECO Subcontract, PCS did not contemplate work consisting of the approximately 518,000 gallons of water that was disposed of by Unitek. Tr. at 1-158:2-17. Chang admitted that he does not know anything about the 518,000 gallons of water other than what he has learned through the invoices produced in discovery. Tr. at 1-158:18-21.

143. The water removed and disposed of by Unitek was rainwater and water from filtration of asbestos abatement that was not in the building at the time LVI submitted its proposal. Tr. at 2-103:16-23. The original plan for disposal of such wastewater was for LVI to pump it into a sanitary sewer line instead of hauling away and disposing of it somewhere else. Tr. at 2-103:24 to 2-104:10. Consequently, there was no specific line item for disposal of the waste water that Unitek handled in LVI's proposal to HECO, and in LVI's HECO Prime Contract. Tr. at 2-102:18 to 103:4.

144. Moore testified that the procedure for disposing of wastewater changed because of HECO's concerns over the volume of the water, the permitted flow rates and its fear of overcharging the sewer system. Thus, HECO agreed to pay to have it shipped and removed offsite. Tr. at 2-104:15 to 105:3. HECO characterized the water as oil-containing. Tr. at 2-94:22 to 2-95:11. LVI had to obtain a change order in its HECO Prime Contract to add off-site disposal of this wastewater. Tr. at 2-105:4-24.

145. For this type of work performed solely by a subcontractor, LVI's contract with HECO required that LVI obtain a detailed breakdown of the labor and material charges from the subcontractor and submit that breakdown with LVI's price to HECO using the subcontractor's total price plus a 10 percent markup for LVI for both overhead and profit. Ex. P-8 at 35; Tr. at 2-105:16 to 106:17. LVI submitted the PCS pricing of $2.50 per gallon for "Liquids, other" (item 43 in its proposal), and $1.50 for "Liquids, petroleum containing" (item 41 in its proposal), but HECO required multiple subcontractor bids. Tr. at 2-106:21 to 107:19.

146. LVI solicited a quote from Unitek which proposed to perform the work for $0.69 per gallon for "rainwater/oily water," as stated in the subcontract that LVI subsequently entered into with Unitek. Ex. P-35 at 1; Tr. at 2-107:20 to 108:2, 109:1-10. LVI submitted the Unitek proposal to HECO, which

approved Unitek as the subcontractor for this task and a total charge by LVI of $0.74 per gallon for Unit 5 and $0.72 per gallon for Unit 7.  Tr. at 2-109:11-21. Accordingly, LVI's HECO Prime Contract was then amended to add 493,000 gallons of wastewater at those rates.  Tr. at 2-109:22 to 2-110:3.

147.  The change order was not formally executed until October 2013. Tr. at 2-183: 21-24, 2-195:1-4.  But HECO had approved it earlier in 2013 at about the time that Unitek began removing the wastewater.  Tr. at 2-195: 15-20.

148.  It is wholly speculative whether PCS would have performed the work under a change order (and at what price) if LVI had offered responsibility for the work to PCS at a renegotiated price.  Chang testified that, as a waste broker, PCS would not have handled the 518,000 gallons of wastewater for $0.69 per gallon (as Unitek did).  Tr. at 1-160:7-13.  To do so, he estimated that PCS would have incurred costs at about $0.95 per gallon.  Tr. at 1-160:14-16.  At those rates, PCS would have lost money if paid $0.69 per gallon.

## 2.  *Non-hazardous Solid Waste*

149.  LVI used Tajiri Demolition and Disposal LLC ("Tajiri") between August 1, 2013 and May 28, 2017 to transport and dispose of mixed waste, rock, and dirt (i.e., non-hazardous solid waste) totaling 264.45 tons in connection with the HECO Project.  Stip. Facts ¶ 39; Ex. P-1 at 119:19-21; Exs. P-

76-1 to P-76-22; P-67A. Such work falls within Line Item 6 of the HECO Subcontract at a rate of $150 per ton. Chang Decl. ¶ 68; Ex, P-12 at 4. PCS calculates that it would have earned $22,478.25 if it had performed this work, and the parties have stipulated that that amount was correctly calculated (although, as with the ACM work, they have not stipulated that PCS is entitled to it as damages). *See* ECF No. 159; Ex. P-67A. The court accepts the stipulation, and therefore does not independently calculate this amount of proposed damages.

**F.     PCS Work on the HECO Project Outside the Scope of the HECO Subcontract**

    *1.     Mercury Component Removal*

        150.  PCS seeks recovery on an unjust enrichment basis for work it performed for LVI that was related to, but outside the scope of, the HECO Subcontract. On September 7, 2013, PCS sent Invoice 7864-06 to LVI for $14,435.86. Ex. P-39. The invoice was for time and materials relating to mercury component removal for the HECO Project that does not fall within any specific line item in the HECO Subcontract. Chang Decl. ¶ 39; *see also* Ex. P-39 at 1 ("Provide mercury component removal (T & M ordered by Mike Moore) at HECO Power Plant"). The invoice also included a charge for transportation and disposal of ten drums of hazardous oil, which is also outside the scope of the HECO Subcontract. Tr. at 1-162:2 to 164:17; Ex. P-39 at 2. Chang attests that PCS

charged its standard labor and equipment rates for the work.  Chang Decl. ¶ 39; *See* Ex. P-82 (standard rates).

151.  LVI admits that it has not paid Invoice 7864-06, and PCS has not received payment for the invoice from LVI.  Ex. P-86 (Request For Admissions No. 11); Chang Decl. ¶ 39.

152.  Moore testified that he did not approve Invoice 7864-06 for payment because there was no substantiation of the work described in the invoice.  Tr. at 2-112:19-22.  LVI admits, however, that PCS performed all the work described in Invoice 7864-06.  *See* Ex. P-86 (Requests for Admission Nos. 9 & 10).

153.  The line item in Invoice 7864-06 for "Transportation and Disposal of hazardous oil" is listed with a quantity of "10" at "750," for an amount of $7,500.  Ex. P-39 at 2.  The corresponding documentation confirms that this refers to 10 drums of hazardous oil.  Ex P-39 at 11.  The PCS rate of $750 (although apparently supported by standard PCS prices, *see, e.g.*, Ex. P-79 at 2), is nevertheless inconsistent with the lower rate of $700 per drum of hazardous sludge that PCS charged LVI in July 2012 (for 7 drums) and in April 2013 (for 41 drums).  Accordingly, a rate of $700 (not $750) per drum is the more appropriate rate for this line item in Invoice 7864-06, for a total of $7,000 (not $7,500).

154.  The list of PCS's standard rates for labor and equipment provided at Ex. P-82 substantiates most of the other line items in Invoice 7864-06. The following items, however, are *not* listed in the standard prices in Ex. P-82, and the court is otherwise unable to confirm (and would thus be unable to award) these amounts:  (1) "Transportation and Disposal of non-hazardous empty bags" (2 at $150 for a total of $300); (3) "pipe wrench" (3 at $15 for a total of $45); and (4) "tool set" (3 at $25 for a total of $75).  In this regard, Chang's testimony was too vague and non-specific to meet PCS's burden to prove the costs for these specific items.  *See* Tr. at 1-82:15 to 1-83:22; Chang Decl. ¶ 39.

155.  The total of the unsubstantiated amounts in Invoice 7864-06 at Ex. P-39 is $920 ($500 plus $300 plus $45 plus $75).  The Invoice listed $13,786.25 as the subtotal.  Subtracting $920 from $13,786.25 results in a revised subtotal of $12,866.25.  Hawaii general excise tax at 4.712% on this amount is $606.26.  Thus, the total substantiated amount for Invoice 7864-06 is **$13,472.51** ($12,866.25 plus $606.26).

## 2.  *Mobilization, Demobilization, and Documentation*

156.  PCS also seeks $25,000 for mobilization, demobilization, preparation of a waste management plan, and waste documentation.  It sought this

amount in Invoice 7864-07 dated October 15, 2014. Ex. P-41. This invoice was submitted almost two years after the services would have been performed.

157. Chang admitted at trial that PCS issued the October 2014 invoice in preparation for filing a complaint. Tr. at 1-165:17-19. And Chang's explanation at trial was confusing; he testified that "normally we'll bill the demobilization or mobilization either at the beginning like a certain percentage, but we never bill. So that's why when come to the dispute [with LVI], so we send out this invoice to cover . . . those line items." Tr. at 1-165: 12-16.

158. The evidence does not support PCS's entitlement to any recovery for tasks in this October 2014 invoice (Invoice 7864-07). Specifically:

- Moore testified that (1) he never agreed to pay PCS $7,500 for mobilization and can't identify anything PCS did to "mobilize" other than drive to the jobsite (Tr. 2-114:6-15), (2) any mobilization relating to the mercury cleaning services should have been included in the cost-plus invoice for those services that PCS issued one year earlier in September of 2013, Ex. P-39 (Tr. at 2-200:19 to 2-201:13), and (3) there is no evidence to support that the reasonable value of the mobilization services provided is $7,500.00;

- Moore testified that he never agreed to pay PCS $5,000 for a waste management plan, and never saw a plan. Tr. at 2-114:16-24. Indeed, Chang

admitted that there is no document that he can identify as a waste management plan.  Tr. at 1-168:11-17; and

  • Chang admitted that the $5,000 charge for waste documentation was for the waste manifests (Tr. at 1-168:4-8), but Moore testified that he never agreed to pay $5,000 for preparation of waste manifests (Tr. at 2-114:25 to 2-115:11) and that preparation of waste manifests was included in the unit prices for hauling and disposal of the various materials (Tr. at 2-115:12-21).

## G.    Recovery Claimed by PCS for the HECO Project

159.  Count I of the Amended Complaint asserts that LVI breached the HECO Subcontract by using vendors other than PCS to perform waste transportation and disposal services in the HECO Project.  For Count I, PCS seeks damages of $1,006,501.10, which consist of the profits PCS claims it would have earned if LVI had given it all the waste transportation and disposal work that was diverted to other vendors.  PCS calculates that it would have earned $699,044.75 in profits for the ACM work that was diverted to Waste Management; $284,978.10 in profits for the oily wastewater work that was diverted to Unitek; and $22,478.25 in profits for non-hazardous solid waste work that was diverted to Tajiri.  These claimed amounts are summarized at Ex. P-64A, as supported by other Exhibits.  *See* Ex. P-62A; P-63B; Ex. P-65A; Ex. P-66A; Ex. P-67A; *see also* Chang Decl.

¶¶ 56-71.  As discussed in Finding 60, the parties stipulated that PCS's calculations for these claimed damages are correct, although they did not stipulate that PCS is actually entitled to any damages.  *See* ECF No. 159.

160.  PCS also seeks prejudgment interest on damages for Count I at a statutory interest rate of 10% per annum set forth in Hawaii Revised Statutes ("HRS") § 478-2, with interest beginning to accrue 60 days from either: (a) the date of the invoice from the vendor who handled the waste stream in question, or (b) if no invoice is available, the date of service for the waste stream.  The parties stipulated to this commencement date for prejudgment interest calculations.  *See* Chang. Decl. ¶ 62; Elijah Yip Decl. of Dec. 6, 2017 ("Yip Decl.") ¶ 26, ECF No. 141-2; ECF No. 159.

161.  The parties have also stipulated that, as of October 1, 2017, a total of $373,347.69 in prejudgment interest has accrued with respect to the claimed damages for Count I, broken down as follows:  $264,860.24 for the claimed lost profits for ACM work; $102,722.89 for the claimed lost profits for the oily wastewater work; and $5,764.55 for claimed lost profits for disposal of non-hazardous solid waste.  *See* ECF No. 159; Ex. P-64A.  The claimed per diem prejudgment interest amounts corresponding to each diverted waste load are

summarized at Ex. P-64A, as supported by Exhibits P-62A, P-63B, P-65A, P-66A, and P-67A; *see also* Chang Decl. ¶¶ 56-71; Yip Decl. ¶ 26.

162.  Count II of the Amended Complaint asserts that LVI was unjustly enriched by PCS's work on the HECO Project as described in PCS Invoices 7864-06 for $14,435.86 and 7864-07 for $25,000.  PCS seeks restitution of the invoiced amounts.  *See* Ex. P-39; Ex. P-41.

163.  For the restitution claim in Count II, PCS seeks prejudgment interest on the amounts stated in Invoices 7864-06 and 7864-07 at 10% per annum under HRS § 478-2.  As stipulated, prejudgment interest commences accruing sixty days after the dates of the invoices.  If the full amount of Invoice 7864-06 is awarded, PCS proffers that prejudgment interest has been accruing at the per diem rate of $3.96 as of November 6, 2013.  And if the full amount of Invoice 7864-07 is awarded, PCS proffers that prejudgment interest on Invoice 7864-07 has been accruing at the per diem rate of $6.85 as of December 14, 2014.  *See* ECF No. 141 at 64-65.  Recovery for these two invoices was addressed in Findings 153 through 158.

## H.     The Kahuku Project and the Kahuku Subcontracts

164. The Kahuku Project began with a fire in a Battery Energy Storage System Building ("BESS Building") at the wind generation facility

operated by First Wind Energy, LLC ("First Wind") in Kahuku in the summer of 2012. Defendants understood that Xtreme Power, Inc. ("Xtreme Power") was the contractor for the BESS Building. Lynn Bruce Decl. ¶ 4, ECF No. 145-2.

165. The work on the Kahuku Project was divided into roughly two categories: (1) Phase 1: Environmental Control and Evidence Investigation, and (2) Phase 2: Demolition and Disposal of the BESS Building. Stip. Facts ¶ 40.

166. With respect to Phase 1 of the Kahuku Project, PCS and NRS entered into three Subcontracts/Purchase Orders (collectively, the "Kahuku Subcontracts"):

- Subcontract/Purchase Order No. 23465 dated September 5, 2012 for $125,000 plus taxes ("PO 23465"). Ex. P-42.

- Subcontract/Purchase Order No. 23538 dated September 25, 2012 for $34,000.00 plus taxes ("PO 23538"). Ex. P-43.

- Subcontract/Purchase Order No. 23797 dated December 17, 2012 for $53,528.77 plus taxes ("PO 23797"). Ex. P-49.

Stip. Facts ¶ 41.

167. All of the Subcontract/Purchase Orders for the Kahuku Project contain the following "pay-if-paid" provision:

Upon written approval by Contractor and the Owner, Subcontractor's invoice shall be paid, in the net amount of its request, if and only if, Contractor receives payment from the Owner for said invoice. Contractor's receipt of payment from Owner for Subcontractor's invoice is an

67

express condition precedent to Contractor's obligation to make payment to Subcontractor. If Contractor does not receive payment from the Owner for said invoice, notwithstanding whether same was approved, the Contractor shall have no further obligation to pay Subcontractor[.]

Stip. Facts ¶ 42.

### 1.     PCS's Work on the Kahuku Subcontracts

168.  The subject of Count III for breach of contract relating to the Kahuku Subcontracts includes the following invoices issued by PCS:

a.  PCS submitted Invoice 8246-13 dated May 4, 2013 to LVI in the amount of $3,560.21 for work performed by PCS pursuant to PO 23797.  PCS performed the services stated in the invoice.  Stip. Facts ¶ 49; Ex. P-57 at 2.

b.  PCS submitted Invoice 8246-14 dated May 4, 2013 to LVI in the amount of $3,350.78 for work performed by PCS pursuant to PO 23538.  PCS performed the services stated in the invoice.  Stip. Facts ¶ 50; Ex. P-57 at 3.

c.  PCS submitted Invoice 8246-15 dated May 4, 2013 to LVI in the amount of $6,240.84 for work performed by PCS pursuant to PO 23465.  PCS performed the services stated in the invoice.  Stip. Facts ¶ 51; Ex. P-57 at 5.

d.  PCS submitted Invoice 8246-18 dated August 3, 2013 to LVI in the amount of $5,450.26 for work performed by PCS pursuant to PO 23465.  PCS performed the services stated in the invoice.  Stip. Facts ¶ 55; Ex. P-59 at 3.

e.  PCS submitted Invoice 8246-19 dated August 3, 2013 to LVI in the amount of $5,340.31 for work performed by PCS pursuant to PO 23797.  PCS performed the services stated in the invoice.  Stip. Facts ¶ 56; Ex. P-59 at 6.

169.  Within the scope of work of PO 23538 is provision of a 40 foot container to store materials at the site of the BESS building fire.  Ex. P-43 at 2.  The price of PO 23538 was not to exceed ("NTE") $34,000.  *Id.*

170.  On September 27, 2012, PCS and NRS executed Change Order 23538-1, which increased the price of PO 23538 by $20,000 to NTE $54,000.  The basis for Change Order 23538-1 included loading evidence from the site of the fire into a 20 foot container and shipping it to Menlo Park, California.  Ex. P-44 at 2.

171.  On behalf of Defendants, PCS shipped a container of evidence to an engineering firm in Menlo Park that First Wind hired.  *See* Lynn Charles Bruce, Jr. Dep. ("Bruce Dep."), Ex. P-4, at 30:11 to 31:1.

172.  On October 8, 2012, PCS submitted to NRS its first invoice (Invoice 8246-03) for work done pursuant to PO 23538.  Ex. P-47.  Invoice 8246-03 charged $53,926.68 for the following work: "Provided equipment, labor and materials to secure and shipping evidence to US Mainland (Kahuku Wind Farm)."  *Id.* at 3.

173.  On October 9, 2012, Lynn Bruce, a Senior Project Manager at NRS, approved Invoice 8246-03 for payment.  Bruce noted in an email to the NRS accounts payable department: "I have also compared this invoice to our change order #2 scope of work and the PO issued to the sub (NTE $54k)."  Ex. P- 48 at 1.

174.  The container of evidence that was shipped to Menlo Park was not unloaded, causing PCS to incur monthly demurrage charges beyond the amount originally expected.  At the end of December 2012, PCS alerted Defendants that demurrage charges were adding up.  Ex. P-50; Chang Decl. ¶ 48.

175.  On January 2, 2013, Bruce wrote an email to the owner of the Kahuku Project, Xtreme Power, stating:  "Is it possible to get the evidence unloaded from the container sent to Exponent?  The demurrage is adding up from the extended time and is about to get extremely expensive.  We need to have the container emptied so it can be returned."  Ex. P-51 at 1.

176.  By February 2013, the container still had not been unloaded. Ex. P-52; Chang Decl. ¶ 49.

177.  On February 8, 2013, Moore instructed Chang to "[s]hoot [Bruce] your final invoice for all costs since your last billing so we can provide client a final package to include container."  Ex. P-52 at 1.

178.  On February 21, 2013, Chang sent an email to Bruce attaching Invoice 8246-09 for $6,492.14 and stating:  "Attached is the invoice through 2/25/13 for the container demurrage.  $1,550/month plus 4.712% tax for any demurrage forward."  Ex. P-54 at 1; Ex. P-55 at 2.

179.  On February 25, 2013, PCS and NRS entered into Change Order 23538-2, which increased the price of PO 23538 by $6,492.14 — the same amount as Invoice 8246-09 — for a total of NTE $60,492.14.  The stated basis for Change Order 23538-2 is: "Dust fence, steel plates, tents, and connex all on site longer than initially proposed."  Ex. P-56.  Thereafter, PCS and NRS did not execute any more change orders to PO 23538 for demurrage charges.  Chang Decl. ¶ 52.

180.  PCS sent two more invoices to NRS for additional demurrage charges.  On May 4, 2013, PCS sent to NRS Invoice 8246-16 in the amount of $4,869.11 for demurrage charges from February 26, 2013 to May 25, 2013.  Ex. P-57 at 6.  On August 3, 2013, PCS sent to NRS Invoice 8246-17 in the amount of $3,246.07 for demurrage charges from May 26, 2013 to July 25, 2013.  Ex. P-59 at 2.  These invoices, which have not been paid, exceeded the price in Change Order 23538-2 of NTE $54,000, and were not covered by any change order.  Chang Decl. ¶ 55.

## 2. *Defendants' Collection Efforts*

181.  Defendants did not issue invoices to First Wind and/or Kahuku Wind Power LLC for the services that are the subject of certain PCS Invoices, including 8246-13, 8246-14, 8246-15, 8246-16, 8246-17, 8246-18, and 8246-19 (collectively, the "Unsubmitted Kahuku Invoices").  Stip. Facts ¶ 58.

182.  Defendants have no explanation for why they did not submit the Unsubmitted Kahuku Invoices to Xtreme Power or First Wind for payment.  *See* Trial Declaration of Michael Thompson ¶ 16 ("Thompson Decl."), ECF No. 145-3.

183.  Defendants' employees noted in an internal email dated April 22, 2013 that PCS invoices had not been sent to Xtreme Power "because we didn't know who to send our invoice[s] to."  Ex. D-30.  This email, however, referred to different invoices than the Unsubmitted Kahuku Invoices, and the unpaid PCS invoices up to April 22, 2013 were sent to Xtreme Power or First Wind for payment.  *See* Thompson Decl. ¶ 11.

184.  In a letter dated June 18, 2013, Defendants sent a demand letter to First Wind Energy, LLC and Kahuku Wind Power LLC demanding payment of $4,473.56 for services performed on the Kahuku Project.  Stip. Facts ¶ 52; Ex. D-31.

185. In a letter dated June 28, 2013, First Wind Energy, LLC refused to pay LVI $4,473.56. Stip. Facts ¶ 54; Ex. D-33.

186. The amount demanded in the June 18, 2013 letter corresponds to Invoice 1001731B that NRS sent to First Wind on April 24, 2013, which sought payment for PCS Invoice 8246-12 plus NRS's markup. Ex. D-26.

187. By letter of June 19, 2013 to Extreme Power, Inc. and Kahuku Wind Power LLC, Defendants demanded payment of $41,268.21 for services performed on the Kahuku Project. Stip. Facts ¶ 53; Ex. D-32.

188. The amount demanded in the June 19, 2013 letter corresponds to Invoice 242029G dated March 7, 2013 and Invoice 242029H dated April 24, 2013 that LVI sent to Xtreme Power. Invoice 242029G was for $5,676 for a demolition permit application. *See* Ex. D-29 at 1. Invoice 242029H was for $35,592.21, and it sought payment for, among other things, PCS Invoices 8246-06, 8246-04, 8246-09, 8246-07, 8246-11, and 8246-10. *See* Ex. D-24 at 1-2.

189. Three of the Unsubmitted Kahuku Invoices (8246-13, 8246-14, and 8246-15) were dated May 4, 2013, before Defendants sent the demand letters to First Wind and Xtreme Power. The amounts of these three invoices, however, were not included in the demand letters.

190.  As of May 4, 2013, First Wind had not denied responsibility for PCS's invoices.  In an email dated April 12, 2013 to Bruce, First Wind told Defendants that "discussions continue between First Wind and Xtreme Power." Ex. D-17 at 1.

## I.  Recovery Claimed by PCS for the Kahuku Project

191.  Count III of the Amended Complaint asserts that Defendants breached the Kahuku Subcontracts by failing to pay certain PCS invoices for work PCS performed on the Kahuku Project.  PCS seeks recovery of the amounts for which Defendants did not seek payment from Xtreme Energy or First Wind, specifically PCS Invoices 8246-13, 8246-14, 8246-15, 8246-18, and 8246-19, which total $23,942.46.

192.  PCS also seeks prejudgment interest on the amounts of the five unpaid invoices.  Applying a statutory interest rate of 10% per annum provided in HRS § 478-2 and based on the parties' stipulation that prejudgment interest begins accruing 60 days after the invoice date, prejudgment interest begins accruing at the following per diem rates and dates:

| Invoice | Invoice Date | Per Diem | Commencement Date |
|---------|--------------|----------|-------------------|
| 8246-13 | 05/04/13 | $0.98/day | 07/03/13 |
| 8246-14 | 05/04/13 | $0.92/day | 07/03/13 |

| 8246-15 | 05/04/13 | $1.71/day | 07/03/13 |
| 8246-18 | 08/03/13 | $1.49/day | 10/02/13 |
| 8246-19 | 08/03/13 | $1.46/day | 10/02/13 |

193.  Count IV of the Amended Complaint asserts that Defendants were unjustly enriched by PCS incurring demurrage charges outside the scope of the Kahuku Contracts or any applicable change order.  PCS seeks restitution of the amounts billed in Invoices 8246-16 ($4,869.11) and 8246-17 ($3,246.07), which total $8,115.18.  *See* Ex. P-57 at 6; Ex. P-59 at 2.

194.  PCS also seeks prejudgment interest on the amounts stated in Invoices 8246-16 and 8246-17 at the statutory interest rate of 10% per annum. Prejudgment interest commences accruing sixty days after the dates of the invoices.  Prejudgment interest on Invoice 8246-16 has been accruing at the per diem rate of $1.33 as of July 3, 2013.  Prejudgment interest on Invoice 8246-17 has been accruing at the per diem rate of $0.89 as of October 2, 2013.

## J.    Provisions for Attorney's Fees and Costs

195.  The HECO Subcontract contains an attorney's fees clause regarding "All claims, disputes and other matters in question between the parties," providing that "The prevailing party in any such litigation . . . shall be entitled to

recover reasonable attorney's fees, costs and expenses incurred in litigating . . . the dispute." Ex. P-12 at 9 ¶ 25.

196. The Kahuku Subcontracts contain nearly identical attorney's fees clauses as in the HECO Subcontract. *See* Ex. P-42 at 6 ¶ 25; Ex. P-43 at 7 ¶ 25.

## V. <u>CONCLUSIONS OF LAW</u>

### A. Federal Jurisdiction

1. PCS is a limited liability company, whose citizenship for purposes of 28 U.S.C. § 1332 is that of its members and owners. *See, e.g.*, *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) ("[A]n LLC is a citizen of every state of which its owners/members are citizens.").

2. PCS's members are both residents of Hawaii, and were Hawaii residents at all relevant times. *See* Finding 1. Citizenship for purposes of 28 U.S.C. § 1332 is determined by domicile (not residence). *See, e.g.*, *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001) ("[A] natural person's state citizenship is then determined by her state of domicile, not her state of residence. A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return.") (citation omitted). Nevertheless, "[i]t is a longstanding principle that the place where a person lives is

76

taken to be his domicile until facts adduced establish the contrary." *NewGen, LLC*

*v. Safe Cig, LLC*, 840 F.3d 606, 614 (9th Cir. 2016) (citations and quotation marks

omitted); *see also, e.g.*, *Mondragon v. Capital One Auto Fin.*, 736 F.3d 880, 886

(9th Cir. 2013) (recognizing that "numerous courts treat a person's residence as

prima facie evidence of the person's domicile") (citing cases). And, here, no

evidence indicates that either of PCS's members is *not* domiciled in Hawaii.

Indeed, Defendants removed this action from state court — and thus Defendants

had at least the initial burden to establish diversity — and they affirmatively

alleged that PCS's members appear to be Hawaii citizens for purposes of § 1332.

*See* ECF No. 6 at 3.

3. LVI and NCG are citizens of California, and NRS is a citizen of

Delaware and Texas, for purposes of § 1332. *See* Findings 3 and 4. None of the

Defendants has the same citizenship as PCS.

4. Well over $75,000 is in controversy. Accordingly, the court has

subject matter jurisdiction based on complete diversity of citizenship under § 1332.

**B.    PCS Count I (Breach of Contract — HECO Project) and LVI'S
Counterclaim**

### *1.    LVI Materially Breached the HECO Subcontract*

5. The HECO Subcontract is valid and enforceable. MSJ Order at 14;

*Pac. Commercial Servs.*, 2017 WL 2817883, at *6.

6.  LVI breached the HECO Subcontract by violating its obligation to use PCS exclusively for waste transportation and disposal services in the HECO Project.  *Id.* at 18; 2017 WL 2817883, at \*7.  The exclusivity requirement is essential to the HECO Subcontract.  *See Aickin v. Ocean View Invs. Co.*, 84 Haw. 447, 460, 935 P.2d 992, 1005 (1997) (stating that a material breach must "defeat the object of the parties in making the agreement") (emphasis and citation omitted); *Bishop Trust Co., Ltd. v. Kamokila Dev. Corp.*, 57 Haw. 330, 334, 555 P.2d 1193, 1196 (1976) (noting that material breach goes to the "essence" of the contract).

7.  LVI committed a material breach of the HECO Subcontract when it contracted directly with Waste Management for ACM transportation and disposal beginning as early as January 2013.

8.  LVI committed another material breach of the HECO Subcontract when it used Tajiri for transportation and disposal of non-hazardous solid waste beginning in August 2013.  That is, LVI diverted work to Tajiri that was within the scope of the HECO Subcontract in violation of LVI's contractual obligation to use PCS for all transportation and disposal of waste in the HECO Project.

9.  PCS failed to prove by a preponderance of the evidence that LVI breached the HECO Subcontract when LVI used Unitek for disposal of "oily wastewater" for the HECO Project.

## 2.    *Duration of LVI's Breach*

10.  LVI argues that PCS is not entitled to recover its lost profits due to LVI's diversion of waste transportation and disposal work to other vendors because, according to LVI, PCS was the first to breach the HECO Subcontract.  It relies on the principle that a party who has materially breached a contract is not entitled to require the other party to perform its duties under the contract.  *See PR Pension Fund v. Nakada*, 8 Haw. App. 480, 491, 809 P.2d 1139, 1146 (1991) ("However, as a general rule, 'a party cannot recover for a breach of contract if he fails to comply with the contract himself[.]'").  "A party who first commits a material breach cannot enforce the contract.  Otherwise stated, a party who has materially breached a contract is not entitled to recover damages for the other party's subsequent nonperformance of the contract, since the latter party's performance is excused."  23 *Williston on Contracts* § 63:3 (4th ed. 2011) (footnotes omitted).

11.  To the extent LVI argues that the first-to-breach rule excused it from honoring its contractual obligations to PCS's material breach of the contract, LVI asserts an affirmative defense.  *See* LVI's First Amended Answer to Amended Complaint, ECF No. 105, ¶ 84 (asserting defense of Plaintiff's material breach of contract); *see also, e.g.*, *Frank Lloyd Wright Found. v. Kroeter*, 697 F. Supp. 2d 1118, 1133 (D. Ariz. 2010) (noting that claim of material breach excusing further performance is an affirmative defense); *Centex Constr. v. Acstar Ins. Co.*, 448 F. Supp. 2d 697, 714 (E.D. Va. 2006) (describing first material breach of contract as an affirmative defense).

12.  LVI has the burden of proving the validity of an affirmative defense by a preponderance of the evidence.  *See Carvalho v. Raybestos-Manhattan, Inc.*, 794 F.2d 454, 456 (9th Cir. 1986) ("Under Hawaii law the defendant has the burden of proof on all affirmative defenses."); *Parris v. Wyndham Vacations Resorts, Inc.*, 979 F. Supp. 2d 1069, 1081 (D. Haw. 2013) (reasoning that an affirmative defense must be proven by a preponderance of the evidence); *World Fuel Servs., Inc. v. John E. Retzner Oil Co., Inc.*, 234 F. Supp. 3d 1234, 1238-39 (S.D. Fla. 2017) (dismissing affirmative defense of material breach because defendant offered no evidence to explain how plaintiff materially breached the contract).

13. None of the theories LVI relies on in asserting the first-to-breach rule as an affirmative defense are viable. Each theory is addressed as follows:

**a.    Charging the $700 per drum unit price**

14. LVI claims that PCS materially breached the HECO Subcontract by charging it $700 per drum for hazardous solid waste transportation and disposal, and that this breach occurred before LVI began diverting the ACM work to Waste Management in January 2013. This argument fails for multiple reasons.

**(1) LVI agreed to the $700 per drum unit price**

15. Under Hawaii law, the existence of mutual assent or intent to accept is determined by an objective standard. *United Pub. Workers, AFSCME, Local 646 v. Dawson Int'l, Inc.*, 113 Haw. 127, 141, 149 P.3d 495, 509 (2006). "[T]he intent to incur mutual obligations is implied from the *actions* of the parties." *Kemp v. Haw. Child Support Enf't Agency*, 111 Haw. 367, 391, 141 P.3d 1014, 1038 (2006) (emphasis in original).

16. "Under Hawai'i law, an implied contract is formed when 'the intention of the parties is not express, but an agreement in fact, creating an obligation, is implied or presumed from their acts, as in the case where a person performs services for another, who accepts the same . . . or where a person performs services for another on request.'" *Queen's Med. Ctr. v. Kaiser Found.*

*Health Plan, Inc.*, 948 F. Supp. 2d 1131, 1146 (D. Haw. 2013) (quoting *Durette v. Aloha Plastic Recycling, Inc.*, 105 Haw. 490, 504, 100 P.3d 60, 74 (2004)).

17. LVI and PCS mutually assented to amend the HECO Subcontract with respect to the unit price for transportation and disposal of non-bulk quantities of hazardous solids (Line Item 4). PCS and LVI engaged in negotiations over a price adjustment for Line Item 4 as contemplated by the Small Font Provision. The credible evidence establishes that LVI knew or should have known that PCS was charging $700 per drum instead of $700 per ton in revised Invoice 7864-01 for seven drums of sludge and sediment. *See* Finding 100. Therefore, LVI's approval and payment of the invoice, coupled with its failure to object to the price until eight months later, constitutes objective manifestation of its assent to the $700 per drum unit price used in the invoice. Accordingly, PCS did not materially breach the HECO Subcontract by charging $700 per drum for seven drums of sludge and sediment in revised Invoice 7864-01.

18. LVI's belated objection to the $700 per drum rate in August 2013 — eight months after LVI assented to the rate — did not negate its earlier assent to the rate. *See Barwick Pac. Carpet Co. v. Kam Haw. Constr., Inc.*, 2 Haw. App. 253, 257, 630 P.2d 638, 641 (1981) (holding that contractor was contractually obligated to pay for upgraded materials that supplier shipped to it where it made

partial payment and did not object to goods until nearly a year after the last

shipment); *Hew v. Aruda*, 51 Haw. 451, 459, 462 P.2d 476, 481 (1969) ("Certainly

silence in the light of previous dealings between parties may operate as assent.");

*see also Horizon Sec. & Vault Complex v. BFI Waste Sys. of N. Am.*, 2003 WL

22872097, at *2 (E.D. La. Dec. 1, 2003) (holding that plaintiff consented to price

increases for waste disposal services when it continued to pay the periodically

increasing invoices without question or complaint for nine years).

19. PCS's use of the $700 per drum unit rate for 41 drums of sludge

and sediment in 2013 — another non-bulk load of hazardous solids — did not

constitute a breach of the HECO Subcontract because of the prior agreement to use

that unit rate for non-bulk quantities of hazardous solids. The use of the $700 per

drum rate in June 2013 was consistent with the prior course of dealing between

PCS and LVI. *See Stewart v. Brennan*, 7 Haw. App. 136, 143, 748 P.2d 816, 821

(1988) (noting that a trier of fact may consider the course of dealing between the

parties in construing the obligations of a contract). "A course of dealing can create

a contractual expectation." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d

1096, 1102 (9th Cir. 1999) (citing *Stewart*).

20. The credible evidence establishes that LVI knew or should have

known that PCS was charging $700 per drum in Invoice 7864-05 for the 41 drums

of sludge and sediment.  *See* Finding 116.  Its approval and payment of the invoice

constitutes objective manifestation of its assent to the $700 per drum unit price

used in the invoice.  Accordingly, PCS did not materially breach the HECO

Subcontract by charging $700 per drum for 41 drums of sludge and sediment in

Invoice 7864-05.[6]

### (2) Change Order Procedure Provisions Do Not Apply

21.  LVI argues that an agreement to modify the $700 per ton rate to

the $700 per drum rate was subject to change order procedures in various

provisions of the HECO Subcontract.  The Court rejects this argument.

### a.      *Note 2 of the HECO Subcontract*

22.  As the court has found, Note 2 in the HECO Subcontract

provides:  "Notification should be made within 3 'business days' if there are

additional costs to the unit prices listed."  *See* Finding 131.  Note 2 resulted from

PCS's concerns about Paragraph 17 of the Terms and Conditions of the HECO

---

[6] The court has briefly considered whether doctrines of mistake or mutual mistake might apply, but concludes that they do not because, as argued by LVI in supplemental briefing, "the mistake must relate to contract formation and not performance."  ECF No. 160 at 4 (citing *ITT World Directories, Inc. v. CIA Editorial de Listas, S.A.*, 525 F.2d 697, 700 n.4 (2d Cir. 1975) and *United States v. Heatley*, 39 F. Supp. 2d 287, 309 (S.D.N.Y. 1998)).  *See also*, *e.g.*, Restatement (Second) of Contracts § 152(1) ("Where a mistake of both parties *at the time a contract was made* as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154") (emphasis added).

Subcontract.  *See* Finding 133.  The Court construes Note 2 and Paragraph 17 together due to their similar subject matter and the history of the negotiations.

23.  Note 2 was negotiated separately from the standard Paragraph 17, and separately negotiated (or added) terms are given more weight than standardized terms or other terms not specifically negotiated.  *See, e.g.*, *In re 604 Columbus Ave. Realty Tr.*, 968 F.2d 1332, 1358 (1st Cir. 1992).  Moreover, specific provisions in a contract control general provisions where the two conflict.  *Kaiser Haw. Kai Dev. Co. v. Murray*, 49 Haw. 214, 227, 412 P.2d 925, 932 (1966); *U.S. Composite Pipe S., LLC v. Frank Coluccio Constr. Co.*, 2014 WL 5023489, at *10 (D. Haw. Oct. 7, 2014) ("In the interpretation of a promise or agreement or a term thereof, . . . specific terms and exact terms are given greater weight than general language.") (citing Restatement (Second) of Contracts § 203 (1981) (other citations omitted)).

24.  The starting point for analyzing the applicability of Note 2 and Paragraph 17 to the price change is an examination of its plain and ordinary meaning.  *See Brown v. KFC Nat'l Mgmt. Co.*, 82 Haw. 226, 240, 921 P.2d 146, 160 (1996).  "[I]n construing a contract, a court's principal objective is to ascertain and effectuate the intention of the parties as manifested by the contract in its entirety.  If there is any doubt, the interpretation which most reasonably reflects the

intent of the parties must be chosen." *Id.* (internal citation and quotation marks omitted).

25. As the court has found, Note 2 is not a valid defense because the price change from $700 per ton to $700 per drum was not an "additional cost" subject to the notification procedure set forth in Note 2. *See* Finding 135.

26. Moreover, the notification provision in Note 2 states that "[n]otification ***should*** be made within 3 'business days'" Ex. P-12 at 4 (Emphasis added). As such, the notification provision is precatory rather than mandatory. *See McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 346 (8th Cir. 1985) (rejecting argument that word "should" in clause stating that claims "should be settled through Iranian courts" is the equivalent of "shall or "must"); *cf. Conant v. Wells Fargo Bank, N.A.*, 60 F. Supp. 3d 99, 117-18 (D.D.C. 2014) (surveying cases interpreting words "may" and "should" and concluding that contract stating that "Lender may send [Plaintiff] a written notice" does not impose mandatory obligation); *Routh v. Bank of Am., N.A.*, 2013 WL 427393, at *10 (W.D. Tex. Feb. 4, 2013) (language in agreement stating "that no further transfers of the note should occur after the closing date" may have been precatory, so court could not reasonably infer that transfers after closing date were void).

27. The precatory nature of Note 2 is reinforced by the fact that words of a mandatory nature like "must" and "shall" are used elsewhere in the HECO Subcontract, such as in Notes 3 and 5 of Exhibit A to the HECO Subcontract and numerous provisions in the Terms and Conditions. *See Jama v. Immigration & Customs Enforcement,* 543 U.S. 335, 346 (2005) ("The word 'may' customarily connotes discretion. That connotation is particularly apt where, as here, 'may' is used in contraposition to the word 'shall'" (citation omitted)); *PCH Mut. Ins. Co. v. Cas. & Sur., Inc.*, 750 F. Supp. 2d 125, 144 (D.D.C. 2010) ("Nevertheless, as a general matter of contract law, the word 'may' is viewed as a permissive, rather than mandatory, term, particularly when used in contraposition to the word 'shall.'").

28. LVI was the drafter of the HECO Subcontract in general, and Note 2 and Paragraph 17 in particular. As such, even if the clauses are ambiguous, the Court construes Note 2 and Paragraph 17 against LVI. *See Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 78 (9th Cir. 1987) ("Another fundamental rule of contract interpretation is that where language is ambiguous the court should construct the language against the drafter of the contract."); *Mokulele Air Grp., Inc. v. Mesa Airlines, Inc.*, 2009 WL 10677190, at *5 (D. Haw. Jan. 22, 2009) (construing ambiguous clause as permissive because party seeking to

enforce clause drafted the agreement).  Further, the HECO Subcontract does not contain a clause prohibiting any provision in the contract to be construed against the drafter of the agreement.  In short, LVI has failed to prove an affirmative defense based on Note 2 or Paragraph 17.

### b.    Paragraph 10

29.  Paragraph 10 of the Terms and Conditions of the HECO Subcontract pertains to change order procedures for "changes from the original plans and specifications."  Ex. P-12 at 6 ¶ 10.  The change order procedures in Paragraph 10 apply to changes in plans and specifications for construction work, not waste disposal.  *See* Finding 137.  A change in the unit price for transportation and disposal of sludge/sediment does not constitute a change in "plans and specifications" within the meaning of the paragraph, and the change order procedures of that paragraph therefore did not apply to the change of the unit rate to $700 per drum.

### c.    Paragraph 4

30.  Paragraph 4 of the Terms and Conditions of the HECO Subcontract provides: "Requested revisions to Subcontractor's Contract Price are not to be included in its billings until Subcontractor receives Contractor's signed

Change Order.  Authorized charges must be shown, but not billed separately and are to be added or deducted from the Contract Price."  Ex. P-12 at 6 ¶ 4.

31.  Paragraph 4 applies to changes to the fixed price of the contract, if there is a fixed price contract.  *See* Finding 139.  The HECO Subcontract had unit prices rather than a fixed contract price.  Accordingly, the requirements of Paragraph 4 do not apply to the HECO Subcontract.

### d.     Waiver

32.  Although Note 2 and Paragraphs 4, 10 and 17 of the Terms and Conditions of the HECO Subcontract are inapplicable to the change in unit pricing for non-bulk quantities of hazardous solids from $700 per ton to $700 per drum, even if the procedures in those provisions are applicable, LVI waived enforcement of them.

33.  "Waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of such surrender, and it is not essential to its application that prejudice results to the party in whose favor the waiver operates."  *Wilart Assocs. v. Kapiolani Plaza, Ltd.*, 7 Haw. App. 354, 359, 766 P.2d 1207, 1210 (1988) (quoting *Hewahewa v. Lalakea*, 35 Haw. 213, 219 (1939)). "[A] waiver 'may be expressed or implied,' and 'it may be established by express statement or agreement, or by acts and conduct from which an intention to waive

may reasonably be inferred.'"  *Id.*at 359-60, 766 P.2d at 1210-11 (citing 28 Am.

Jur. 2d Estoppel and Waiver § 160 at 845 (1966)) (some editorial marks omitted).

34.  Under Hawaii law, procedures in a construction contract

governing changes are subject to waiver by conduct inconsistent with the

procedures.  *See Stewart v. Spalding*, 23 Haw. 502, 511 (1916); *Saiki v. Lee Sing*,

27 Haw. 399, 406-07 (1923); *E. E. Black, Ltd. v. State*, 50 Haw. 267, 269, 439 P.2d

213, 215 (1968).

35.  PCS told LVI that a price adjustment for non-bulk quantities of

sludge and sediment was necessary.  When PCS received seven drums of sludge

and sediment in 2012, PCS suggested to LVI that it get a change order from

HECO.  PCS submitted the revised version of Invoice 7864-01 to LVI with the

adjusted price of $700 per drum, and it was paid.  In 2013, PCS submitted a second

invoice with the same price, and again, LVI paid the invoice with no objection.

Such conduct by LVI evinced its intention to waive strict compliance with the

change procedures (if applicable) in the HECO Subcontract.

**b.      PCS did not repudiate the HECO Subcontract**

36.  LVI argues that PCS repudiated the HECO Subcontract.  The

basis for this argument is Chang's August 14, 2013 email to Moore in which he

stated, in pertinent part: "Some items are right and some items are under and some

items are over.  LVI took away the items are better than estimated.  When you bid

job, you just have to take risk. When the gravy is taken away, all other prices are

not valid anymore." Ex. P-32 at 1.  Chang made this statement to express the

difficulty of adhering to the $700 per ton price in light of LVI taking away the

profitable ACM work.  His statement was not a repudiation of all of the prices in

the HECO Subcontract.  Chang expressly confirmed that PCS would honor the

HECO Subcontract despite LVI's diversion of the ACM Work.  Based on these

facts, the Court concludes that PCS did not repudiate the HECO Subcontract in

August 2013.

37.  Even if Chang's August 14, 2013 email to Moore constituted a

repudiation of all of PCS's ongoing obligations under the HECO Subcontract, LVI

still materially breached the HECO Subcontract first when it initially diverted the

ACM work to Waste Management in January 2013.  LVI therefore may not avail

itself of the first-to-breach rule.  *See* Conclusion 10.

### c.    LVI Did Not Terminate the HECO Subcontract in Whole or in Part

38.  LVI could not have partially terminated the HECO Subcontract

when it informed PCS on February 5, 2013 that it had contracted directly with

Waste Management for ACM transportation and disposal.  LVI had no basis to

terminate the HECO Subcontract for cause pursuant to paragraph 21(a) of the

Terms and Conditions of the contract. Thus, LVI could only have terminated PCS without cause in accordance with Paragraph 21(b) of the Terms and Conditions.

39. Unlike the termination for cause provision of the HECO Subcontract, the termination without cause provision does not allow LVI to terminate the contract "in whole or in part." *Compare* Ex. P-12 at 8 ¶ 21(b) *with id.* ¶ 21(a). The inclusion of a right to partial termination in Paragraph 21(a) and the omission of such a right in Paragraph 21(b) is deemed to be intentional. *See Santiago v. Tanaka*, 137 Haw. 137, 155, 366 P.3d 612, 630 (2016) ("Under principles of contract interpretation, an agreement should be construed as a whole and its meaning determined from the entire context and not from any particular word, phrase, or clause.").

## C.    Damages for Count I

40. PCS is entitled to an award of damages for Count I of its Amended Complaint for breach of contract in the amount of $721,522.99. This amount comes from $699,044.74 for ACM work diverted to Waste Management, plus $22,478.25 for non-hazardous solid waste diverted to Tajiri. *See* Findings 60, 149. It excludes the claimed amount for "oily wastewater" tasks done by Unitek. *See* Findings 141 to 148.

41. PCS is entitled to prejudgment interest on this award at the rate of 10% per annum accruing from sixty days after the date of each invoice identified in Exhibits P-65A, P-66A, and P-67A to the date of entry of judgment. Generally, "[i]n diversity actions, state law determines the rate of prejudgment interest, and postjudgment interest is governed by federal law." *Am. Tel. & Tel. Co. v. United Computer Sys., Inc.*, 98 F.3d 1206, 1209 (9th Cir. 1996) (citing *Northrop Corp. v. Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1155 (9th Cir. 1988) (per curiam)). Under Hawaii law, the award of prejudgment interest is within the discretion of the court. *See* HRS § 636-16; *Schmidt v. Board of Dirs. of Ass'n of Apartment Owners of Marco Polo Apartments*, 73 Haw. 526, 533, 836 P.2d 479, 483 (1992). Where the contract at issue does not specify the rate of interest, the statutory rate of 10% per annum applies. *See* HRS § 478-2; *Eastman v. McGowan*, 86 Haw. 21, 28, 946 P.2d 1317, 1324 (1997).

42. As stipulated, the amount of prejudgment interest for Count I (as of October 1, 2017) is $270,624.79, which is the total of $264,860.24 accrued on the $699,044.74 for ACM work and $5,764.55 accrued on the $22,478.25 for the non-hazardous solid work. *See* Ex. P-64A. PCS, however, is entitled to additional prejudgment interest from October 1, 2017 until the date of judgment for this amount (as well as other amounts of prejudgment interest as set forth in these

Findings and Conclusions).  An award for this additional amount is subject to a supplemental filing by PCS, and so — rather than awarding prejudgment interest piecemeal — the court will wait until the final amount of prejudgment interest is calculated before specifying the amount of prejudgment interest.

## D.    LVI's Counterclaim

43.  LVI asserts a counterclaim against PCS for reimbursement of charges that LVI alleged it overpaid.  The counterclaim is based on LVI's allegation that PCS should have charged $700 per ton instead of $700 per drum for transportation and disposal of seven drums of sludge/sediment in 2012 and 41 drums of sludge/sediment in 2013.

44. LVI's counterclaim fails in light of the determination that LVI and PCS agreed by objective standards to change the unit price for transportation and disposal of non-bulk quantities of hazardous solids from $700 per ton to $700 per drum.  *See* Findings 100, 116; Conclusion 20.

## E.    Count II (Unjust Enrichment – HECO Project)

45.  "To recover on an unjust enrichment claim, a plaintiff must prove: (1) the defendant received a benefit without adequate legal basis; and (2) unjustly retained the benefit at the expense of the plaintiff."  *Balboa v. Haw. Care & Cleaning, Inc.*, 105 F. Supp. 3d 1165, 1174 (D. Haw. 2015).

46. There is no dispute that PCS performed the work described in Invoice 7864-06, and no dispute that LVI has not paid that Invoice.

47. It would be unjust for LVI to pay nothing for the services described in Invoice 7864-06.

48. PCS, however, has failed to prove it is entitled to recovery for unjust enrichment as to Invoice 7864-07. As established in Findings 156 through 158, this invoice was submitted late with an unsatisfactory explanation by PCS, and it is unclear that PCS actually performed the work in the invoice (or if it was performed, it was paid as part of the unit prices in the HECO Subcontract).

49. PCS is entitled to an award of restitution for Count II of its Amended Complaint for unjust enrichment regarding Invoice 7864-06 in the amount of $13,472.51 plus additional prejudgment interest from November 6, 2013 to the date of entry of judgment, to be determined in subsequent proceedings. *See* Findings 153 to 155. (The proffered prejudgment interest per diem rate of $3.96 discussed in Finding 163 was based on a different amount, and is thus inapplicable.)

## F.    Count III (Breach of Contract – Kahuku Project)

50. Defendants claim that they are not liable to pay the outstanding invoices issued by PCS for its work on the Kahuku Project due to the inclusion of a

"pay-if-paid" clause in the Kahuku Subcontracts.

51. Pay-if-paid clauses are strictly construed. *See* 8 *Williston on Contracts* § 19.59 (4th ed. 2011). Pay-if-paid clauses make payment of the general contractor a condition precedent to payment of the subcontractor. *See id.* Therefore, Defendants' reliance on the failure of the pay-if-paid clause to be satisfied constitutes an affirmative defense to liability for breach of contract. *See Brown*, 82 Haw. at 246, 921 P.2d at 166; *see also United States ex rel. U.S. Glass, Inc. v. Patterson*, 2014 WL 442853, at *2 (E.D. Pa. Feb. 4, 2014) (construing defendants' reliance on pay-if-paid clause as affirmative defense); *Liberty Mut. Ins. Co. v. Sumo-Nan LLC*, 2015 WL 6755212, at *16 (D. Haw. Nov. 4, 2015) (construing argument of failure of condition precedent as a defense).

52. Defendants failed to submit the seven Unsubmitted Kahuku Invoices to Xtreme Power or First Wind for payment. Five of the seven Unsubmitted Kahuku Invoices are for work within the scope of one of the Kahuku Subcontracts. (Defendants also failed to submit PCS Invoices 8246-16 and 8246-17 for payment, but those invoices are the subject of PCS's unjust enrichment claim (Count IV) rather than the breach of contract claim). The Kahuku Invoices within the scope of the contract are as follows:

| Invoice | Invoice Date | PO | Amount | Exhibit |
|---------|--------------|------|------------|---------|
| 8246-13 | 05/04/13 | 23797 | $3,560.21 | P-57 |
| 8246-14 | 05/04/13 | 23538 | $3,350.84 | P-57 |
| 8246-15 | 05/04/13 | 23465 | $6,240.84 | P-57 |
| 8246-18 | 08/03/13 | 23465 | $5,450.26 | P-59 |
| 8246-19 | 08/03/13 | 23797 | $5,340.31 | P-59 |

**Total:** **$23,942.46**

53. A condition precedent can be waived or excused if the promisor prevents or hinders fulfillment of the condition. *Ikeoka v. Kong*, 47 Haw. 220, 228, 386 P.2d 855, 860 (1963) ("[N]o one can avail himself of the nonperformance of a condition precedent, who has himself occasioned its non-performance.").

54. The "pay-if-paid" clauses in the Kahuku Subcontracts condition payment of PCS invoices on Defendants receiving payment from Xtreme Power and/or First Wind for the work covered by such invoices. Fulfillment of this condition precedent was entirely under Defendants' control. Because Defendants did not attempt to seek payment for five of the Unsubmitted Kahuku Invoices, they are precluded from enforcing the "pay-if-paid" clauses as a condition to performance of their obligation to pay the invoices.

55. As found above, Defendants have no explanation for why they did not submit the Unsubmitted Kahuku Invoices to Xtreme Power or First Wind

for payment.  *See* Finding 182.  In particular, Defendants cannot explain why three of the Unsubmitted Kahuku Invoices that were dated May 4, 2013 (8246-13, 8246-14, and 8246-15), were not included in Defendants' demand letters to First Wind and Xtreme Power dated June 18 and 19, 2013, respectively.

56.  Therefore, Defendants are liable for the amounts stated in PCS Invoices 8246-13, 8246-14, 8246-15, 8246-18, and 8246-19.  PCS is entitled to an award of damages for Count III of its Amended Complaint for breach of contract in the amount of $23,942.46.  *See* Finding 191.

57.  PCS is entitled to prejudgment interest at the per diem rates accruing from the commencement dates as identified in Finding 192, and as reiterated here:

| Invoice | Invoice Date | Per Diem | Commencement Date |
|---------|--------------|----------|-------------------|
| 8246-13 | 05/04/13 | $0.98/day | 07/03/13 |
| 8246-14 | 05/04/13 | $0.92/day | 07/03/13 |
| 8246-15 | 05/04/13 | $1.71/day | 07/03/13 |
| 8246-18 | 08/03/13 | $1.49/day | 10/02/13 |
| 8246-19 | 08/03/13 | $1.46/day | 10/02/13 |

### G.    Count IV (Unjust Enrichment – Kahuku Project)

58.  PCS seeks recovery for unjust enrichment for demurrage charges as set forth in Findings 168 through 180.  PCS sent Invoices 8246-16 and 8246-17 for these demurrage charges, and Defendants have not paid these invoices.

59.  Invoices 8246-16 and 8246-17 are not subject to the "pay-if-paid" clause because they are not within the scope of any of the Kahuku Subcontracts or change orders thereto.  Defendants' receipt of payment from Xtreme Power or First Wind for the demurrage charges covered in these invoices is not a condition precedent to Defendants' payment of the invoices.

60.  It would be unjust for Defendants not to pay PCS for the demurrage charges in Invoices 8246-16 and 8246-17.  *See, e.g.*, *Balboa*, 105 F. Supp. 3d at 1174.  Accordingly, PCS is entitled to restitution of the amounts stated in Invoices 8246-16 and 8246-17 under Count IV of its Amended Complaint for unjust enrichment in the amount of $8,115.18.  *See* Finding 193.

61.  PCS is entitled to prejudgment interest at the following per diem rates: (a) for Invoice 8246-16, $1.33 from July 3, 2013 to the date of entry of judgment; and (b) for Invoice 8246-17, $0.89 from October 2, 2013 to the date of entry of judgment.

**H.   Attorney's Fees and Costs**

62.   PCS is the prevailing party in this action.  It is entitled to an award of reasonable attorney's fees, expenses, and costs pursuant to the terms of the Subcontracts.  *See* Findings 195 & 196.

## VI.  <u>CONCLUSION</u>

PCS is entitled to an award in the amount of **$767,053.14** plus additional prejudgment interest.  This amount is broken down as follows:

LVI is liable to PCS on Count I for breach of the HECO Subcontract.  PCS is entitled to an award of **$721,522.99** (the total of $699,044.74 plus $22,478.25) plus prejudgment interest to be determined in supplemental proceedings.  *See* Conclusion 40.

LVI is liable to PCS on Count II for unjust enrichment with respect to work performed by PCS on the HECO Project that is beyond the scope of the HECO Subcontract.  PCS is entitled to an award of **$13,472.51** plus prejudgment interest to be determined in supplemental proceedings.  *See* Conclusion 49.

LVI is liable to PCS on Count III for breach of the Kahuku Subcontracts.  PCS is entitled to an award of **$23,942.46** plus prejudgment interest to be determined in supplemental proceedings.  *See* Conclusion 52.

LVI is liable to PCS on Count IV for unjust enrichment with respect to work performed by PCS on the Kahuku Project that is beyond the scope of the Kahuku Subcontracts. PCS is entitled to an award of **$8,115.18** plus an amount of prejudgment interest to be determined in supplemental proceedings. *See* Conclusion 60.

These amounts are summarized in the following table:

| Basis of Award | Damages/Restitution |
|---|---|
| Count I (ACM work to Waste Management | $ 699,044.74 (Conclusion 40) |
| Count I (Non-hazardous solids to Tajiri) | $ 22,478.25 (Conclusion 40) |
| Count II (Mercury component removal) | $ 13,472.51 (Conclusion 49) |
| Count III (Kahuku project invoices) | $ 23,942.46 (Conclusion 52) |
| Count IV (Demurrage charges) | $ 8,115.18 (Conclusion 60) |
| **Total** | **$ 767,053.14** |

LVI's counterclaim is dismissed with prejudice.

PCS is to submit a supplemental filing with a proposed final calculation of the amounts for prejudgment interest as of today, August 10, 2018. (Although Judgment will not enter until the amount of prejudgment interest is known, such interest will stop accruing as of today.) This supplemental filing is due by **August 24, 2018**. Because the rates of prejudgment interest are known, the

parties are to meet and confer regarding these calculations and attempt to obtain a stipulation to the total amount.

After entry of Judgment, PCS may also submit an application for reasonable attorney's fees, expenses, and costs in accordance with the court's local rules.

IT IS SO ORDERED.

DATED, Honolulu, Hawaii, August 10, 2018.



      /s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Pac. Commercial Servs., LLC v. LVI Envt'l Servs, Inc.*, Civ. No. 16-00245 JMS-KJM, Findings of Fact and Conclusions of Law

102